**Debra Sue JENNER, Plaintiff–Appellant,**

v.

**James SMITH, Superintendent, Springfield Correctional Facility; Roger Tellinghuisen, Attorney General, State of South Dakota, Defendants–Appellees.**

No. 91–3554.

United States Court of Appeals, Eighth Circuit.

Submitted June 10, 1992.

Decided Jan. 5, 1993.

James Martin Davis, Omaha, NE, argued for plaintiff-appellant.

Patricia J. Cronin, Asst. Atty. Gen., Pierre, SD, argued for defendants-appellees.

Before BOWMAN, LOKEN, Circuit Judges, and LARSON,* Senior District Judge.

LOKEN, Circuit Judge.

Debra Sue Jenner is a South Dakota inmate serving a life sentence for the murder of her three-year-old daughter. She appeals the district court's [1] denial of her petition for a writ of habeas corpus, arguing that her constitutional rights were violated by the admission of involuntary incriminating statements made during lengthy police interviews that were not preceded by *Miranda* warnings. We affirm.

## I.

Prior to trial, Jenner moved to suppress the statements. After a thorough evidentiary hearing, the Beadle County Circuit Court denied the motion, filing both a lengthy Memorandum Opinion and detailed findings of fact and conclusions of law in which the court determined that the statements were voluntarily made during non-custodial questioning. Following Jenner's conviction, a divided Supreme Court of South Dakota affirmed, filing three opinions that discussed these issues in great detail. *State v. Jenner*, 451 N.W.2d 710 (S.D.1990). The dissenters sharply criti-

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. The HONORABLE JOHN B. JONES, United States District Judge for the District of South Dakota.

cized the police officers for questioning Jenner at length without giving *Miranda* warnings, and for failing to tape record the interviews.[2] Our only task as a federal habeas court, however, is to determine whether Jenner's constitutional rights were violated.[3]

 While we review the ultimate issue of voluntariness de novo, subsidiary factual determinations made by the state courts are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *See Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985); *Hill v. Lockhart,* 927 F.2d 340, 346 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 344, 116 L.Ed.2d 283 (1991). We have carefully reviewed the record of the state court proceedings, most particularly the transcript of the evidentiary hearing on Jenner's motion to suppress. We conclude that the state court proceedings satisfied the criteria set forth in § 2254(d)(1)–(7), that its factual determinations are "fairly supported by the record," *see* § 2254(d)(8), and that Jenner has failed "to establish by convincing evidence that the factual determination[s] by the State court [were] erroneous." § 2254(d). Therefore, we must accept those findings and ignore the many fact assertions in Jenner's brief that are inconsistent with the explicit findings of the South Dakota trial court. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Woods v. Armontrout,* 787 F.2d 310, 313 (8th Cir.1986), *cert. denied,* 479 U.S. 1036, 107 S.Ct. 890, 93 L.Ed.2d 842 (1987).

## II.

Three-year-old Abby Jenner was found murdered in her bed on Sunday morning, April 5, 1987. Her body was mutilated by a frenzy of seventy stab wounds inflicted in a prolonged attack the previous night, when only Abby's mother, father, and five-year-old brother were in the Jenner house. Police discovered no signs of forced entry into the house, and found, in plain view atop the kitchen microwave, a Chicago Cutlery knife consistent with the slash wounds on Abby's body.

For the next two days, Jenner and her husband, Lynn Jenner, cooperated extensively with the investigating law enforcement officers. They consented to two interviews on April 5, first at the hospital with Beadle County Sheriff Tom Beerman, and later at their home with Agent Jerry Lindberg of the South Dakota Division of Criminal Investigation (DCI). The Jenners signed a written consent permitting the investigators to search their home and car. They provided hair samples and submitted the clothing and jewelry they had worn the night of the murder for forensic analysis.

On the morning of April 7, the investigators decided to ask the Jenners to submit to polygraph examinations. Sheriff Beerman called Lynn Jenner and asked if they would come to the Beadle County Public Safety Building to answer additional questions, at a time convenient to them. At 1:55 that afternoon, the Jenners arrived in their own vehicle, accompanied by their pastor and by Lynn's parents. Agent Lindberg asked if they would consent to polygraph examinations and advised that they did not have to take a polygraph test or talk further with the investigators; that the test was an investigative tool that could implicate or eliminate them as suspects; that the test results could not be used in court; and that they would be questioned further if they did not pass the test. After signing consent forms, the Jenners went to separate rooms to take the polygraph tests.

Jenner's polygraph testing ended about 3:30 p.m. Her test results indicated decep-

---

**2.** The record suggests that the available tape recording equipment was not operable on April 7. We note that, in federal criminal cases, other circuits have held that incriminating statements are not inadmissible simply because the police failed to record or take notes of the conversations. See *United States v. Short,* 947 F.2d 1445, 1451 (10th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992), and cases cited.

**3.** Jenner's contention that the South Dakota Supreme Court applied the wrong standard of review to the voluntariness issue does not state an independent ground for federal habeas corpus relief.

tion. After reviewing the results, the DCI Agent who administered the test, Fred DeVaney, returned to the room and told Jenner that she had lied and that she was responsible for Abby's death. Agent Lindberg then interviewed Jenner for about twenty minutes, following which Agent DeVaney spoke with her for about one hour. Around 5:00 p.m., Jenner agreed to talk to DeVaney's partner, DCI agent Ken Giegling, who interviewed her until about 9:30 p.m.

All the interviews took place in the small room where Jenner had taken the polygraph test. Only one interviewer was in the room with Jenner, and the door was kept slightly ajar. DeVaney left the room on one occasion and upon returning found that Jenner had left to use the bathroom and returned on her own initiative. DeVaney also left the room to get Jenner a Diet Coke at her request. Lindberg described Jenner's mood during his interview as "chang[ing] within seconds from angry to crying to very calm." DeVaney said Jenner was in tears sometimes, and was at other moments calm and inexpressive. Giegling described her demeanor as wildly varied, from vacant calm to extreme distress.

Throughout these interviews, Jenner continually expressed a desire to cooperate in the investigation by getting to the bottom of her adverse polygraph test results. She told Lindberg, "I'm not lying and know I didn't do this, but maybe I psyched out in the night and don't remember it." She asked each interviewer whether she could have "psyched out" and repeatedly offered to undergo hypnosis, psychological interviews, or any other method that might reveal whether she had killed Abby. She told Agent Giegling she wanted him to be "the vehicle to jar her memory."

Each of the three interviewers told Jenner that she was responsible for Abby's death. They used a variety of questioning techniques aimed at drawing more information from her, such as prefacing questions with the assurance that Jenner was at bottom a good mother and a good Christian, and telling Jenner that there was a "bad Debbie" who was responsible for Abby's death. Giegling raised his voice on several occasions, and accused Jenner of not being truthful. At one point, Giegling asked, hypothetically, what Jenner would think if her husband was at that moment "putting all the blame on her."

Jenner never formally confessed to killing Abby, but she did make at least three damaging admissions during the course of the interviews. First, she frequently qualified her denials by suggesting the possibility that she had "psyched out." More significantly, during Giegling's interview Jenner volunteered a description of the murder as seen through Abby's eyes. "Abby knew the person and was not afraid. Abby saw a knife," Jenner said with a different, higher pitched voice, and then described a Chicago Cutlery knife identical to the one found atop the microwave. "Abby saw a black object," Jenner said, and then described a black model airplane, later found in the Jenner house, that matched a unique wound on Abby's body. She also said the assailant's hair hung down over Abby's crib; hair matching either Jenner's or Abby's was found in Abby's hands. Giegling interrupted this narrative to ask, "Is that person leaning over your daughter you?" Jenner said, "I think so." The final admission occurred at the end of the interviews, when Jenner was briefly reunited with her husband. The officers present testified that, when she saw her husband, Jenner cried out, "I did it, I did it. Did you help me?" Lynn said he had not helped.

Sometime after 9:00 p.m., Giegling terminated the interview, being concerned that Jenner might be nearing a nervous breakdown. A police psychologist was summoned. After advising Jenner that their conversation would not be privileged, he talked with her and concluded that she was alert and aware, was not suffering from any psychological dysfunction, and was not a threat to herself. The police then drove Jenner to the pastor's house, where the family was waiting to take her home. She was not arrested until four months later, when a grand jury indicted her on charges of second degree murder and first degree manslaughter.

Before trial, Jenner moved to suppress her April 7 incriminating statements. Jenner, her husband, the three interviewing officers, and the psychologist testified at the suppression hearing. The state court found that Jenner was aware that she did not have to take the polygraph or answer any questions, was never threatened or restrained in any way, never asked that the questioning stop or an attorney be present, and never expressed a desire to leave. Although Jenner testified that she believed she was not free to leave, the trial judge expressly discredited that testimony. The court concluded that the statements "were freely and voluntarily given and were not the result of compulsion or inducement of any sort." In addition, the court concluded that the officers' failure to give *Miranda* warnings did not require suppression of the statements because Jenner did not undergo "custodial interrogation."

At trial, the prosecution introduced the April 7 incriminating statements through the testimony of the interviewing officers, as well as substantial additional circumstantial evidence of Jenner's guilt. *See State v. Jenner*, 451 N.W.2d at 711–14. Jenner took the stand in her own defense, denied killing Abby, and explained that her April 7 statements were the result of stress, exhaustion, and suggestive questioning. The jury convicted her of second degree murder, and she was sentenced to life imprisonment. After the Supreme Court of South Dakota upheld her conviction on direct appeal, she filed this petition for habeas corpus relief.[4]

The district court denied relief. The court first concluded that the April 7 statements were constitutionally voluntary. Jenner "was at the police station voluntarily and remained there voluntarily," and "she repeatedly consented to the continuation of the interview when asked and even made numerous expressions of a desire to help." Finding that Jenner was young, in good health, and well educated, and an absence of improper police coercion, the court determined that "it cannot be said that her will was overborne." Turning to

the *Miranda* issue, the district court criticized the officers' failure to provide *Miranda* warnings but concluded, after analyzing the six factors set forth in *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990), that the questioning "took place in non-custodial circumstances." This appeal followed.

## III.

■ Jenner first argues that her April 7 statements were involuntary. To merit habeas corpus relief on this claim, Jenner has the burden of proving that she made the April 7 statements only after her "will was overborne and [her] capacity for self-determination critically impaired." *Sumpter v. Nix*, 863 F.2d 563, 565 (8th Cir.1988) (citation omitted). Although Jenner's ability to resist interrogation pressures is relevant to the voluntariness inquiry, her mental condition alone cannot make the April 7 statements involuntary. *See Colorado v. Connelly*, 479 U.S. 157, 165, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). A statement is not constitutionally involuntary unless "the police extorted it from the accused by means of coercive activity." *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir.), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 381 (1987); *see United States v. Goudreau*, 854 F.2d 1097, 1099 (8th Cir. 1988). We review the issue of voluntariness de novo, giving "great weight to the considered conclusions of a coequal state judiciary." *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985).

■ After cooperating extensively with the investigators for two days, Jenner voluntarily came to the April 7 interviews at a time of her own choosing, knowing that the purpose was additional questioning. She consented to a polygraph test after being advised that she need not take the test nor answer further questions. After the polygraph was completed, Jenner was left alone in the testing room from time to time. She left the room at least once on her own and remained in the room answer-

---

4. Appellees concede that Jenner adequately exhausted her state remedies.

ing questions without any reasonably perceived restraint. Jenner's repeated suggestions that she undergo hypnosis or some other procedure that would "jar her memory" conveyed a desire, or at least a willingness, to continue the interview sessions.

The lengthy April 7 interviews were completely devoid of physical threats or coercion. Moreover, the interviewing officers used no improperly coercive questioning tactics. It was not improper to inform Jenner that her polygraph test results indicated deception, *see Bae v. Peters,* 950 F.2d 469, 475 (7th Cir.1991), nor to resume questioning her as the officers had said they would if the test results were adverse. It was likewise permissible to elicit further statements by claiming not to believe her denials. *See United States v. Wolf,* 813 F.2d 970, 975 (9th Cir.1987). Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne. *See, e.g., Miller v. Fenton,* 796 F.2d 598, 607 (3d Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *Martin v. Wainwright,* 770 F.2d 918, 925–27 (11th Cir.1985). "[T]here is nothing inherently wrong with efforts to create a favorable climate for confession." *Hawkins v. Lynaugh,* 844 F.2d 1132, 1140 (5th Cir.), *cert. denied,* 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988). As the Supreme Court said in *Schneckloth v. Bustamonte,* 412 U.S. 218, 224, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973), "very few people give incriminating statements in the absence of official action of some kind."

■ Thus, Jenner's involuntariness claim rests upon the contention that it was inherently coercive to question her at length, without full *Miranda* warnings, and under obviously stressful conditions. These are highly relevant circumstances requiring careful evaluation. But Jenner still must prove that her incriminating statements were the product of an overborne will. *See Evans v. Dowd,* 932 F.2d 739, 741–43 (8th

Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 385, 116 L.Ed.2d 335 (1991). "Any interview of one suspected of a crime will have coercive aspects to it." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977). The fact that the questioning extended for six or seven hours is not per se unconstitutionally coercive. *See Stein v. New York,* 346 U.S. 156, 185–86, 73 S.Ct. 1077, 1093–94, 97 L.Ed. 1522 (1953) (twelve hours of intermittent questioning over a 32–hour period); *Sumpter,* 863 F.2d at 565 (seven and one-half consecutive hours).

The state court found willing participation by Jenner *and* the absence of improper questioning tactics by the investigating officers. At no time did Jenner express a desire to halt the interviews or to speak with an attorney. *See United States v. Jorgensen,* 871 F.2d 725, 730 (8th Cir. 1989). The testimony of the psychologist who evaluated Jenner immediately after the interviews confirmed that she was still alert and in control of her faculties after the lengthy questioning. On this record, we agree with the district court that Jenner—an adult woman with a college degree—has failed to demonstrate that the officers overwhelmed her will and "extorted" the incriminating statements from her. *Compare Ashdown v. Utah,* 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958); *McCall v. Dutton,* 863 F.2d 454, 461 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989).

## IV.

■ Jenner also claims that the April 7 statements were obtained in violation of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The state courts concluded that *Miranda* warnings were not constitutionally required because Jenner was not in custody when she was interviewed on April 7, 1987. We review this custody finding under the clearly erroneous standard. *See Carlson v. Minnesota,* 945 F.2d 1026, 1028 (8th Cir.1991).

■ Custodial interrogation requiring *Miranda* warnings occurs when "there is a

'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983) (citation omitted). Warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Mathiason*, 429 U.S. at 495, 97 S.Ct. at 714. Like voluntariness, the custody issue necessarily focuses upon the totality of the circumstances.

In *Griffin*, 922 F.2d at 1349, we enumerated six "common indicia of custody." The district court concluded that Jenner was not in custody on April 7 because "[f]our of the six [*Griffin*] factors ... indicate a non-custodial situation, and a fifth factor, that of police tactics, only marginally favors a finding of custody." We agree with this analysis. *See United States v. Mottl*, 946 F.2d 1366, 1370 (8th Cir.1991) (warnings not required when five of the six *Griffin* indicia supported a finding that defendant was not in custody at FBI headquarters).

In addition, we note that the *Griffin* factors are not all of equal weight in each case. Here, Jenner had cooperated with the police investigators for two days, voluntarily came to the police station to answer further questions, was advised at the outset that she need not take the polygraph test or submit to further questioning, had obvious freedom to leave at various times during the questioning, and was not arrested even after making incriminating statements. In these circumstances, the finding that Jenner was not in custody on April 7, 1987, is not clearly erroneous.

The judgment of the district court is affirmed.