# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 99-3643

———————

Christopher Simmons,          *
                                 *

         Appellant,        *

                                 *   Appeal from the United States

     v.                        *   District Court for the Eastern

                                 *   District of Missouri.

Michael Bowersox,          *

                                 *

         Appellee.         *

———————

Submitted: September 13, 2000

Filed: January 2, 2001

———————

Before BOWMAN and BEAM, Circuit Judges, and BOGUE,[1] District Judge.

———————

BEAM, Circuit Judge.

Christopher Simmons was convicted in Missouri state court for the first degree murder of Shirley Crook and was sentenced to death. Simmons appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254.

———————

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

Because we find the state court decisions involve neither an unreasonable application of federal law nor an unreasonable determination of the facts, we affirm.[2]

## I.    BACKGROUND

On September 9, 1993, Shirley Crook was abducted from her home and murdered. Her face was covered with duct tape, her hands and feet were bound together, and she was thrown from a train trestle into the Meremac River. The cause of death was drowning.

On September 10, 1993, after receiving information that Christopher Simmons had been involved in the murder, law enforcement officers from the Greater St. Louis Major Case Squad arrested Simmons at his high school and took him to the Fenton Police Department in Jefferson County, Missouri.

Upon arrival at the department, three detectives took Simmons into an interview room. Detective Shane Knoll used an advice-of-rights form to read Simmons the warnings required by <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Simmons then signed a waiver and the detectives commenced interrogation. This initial interrogation lasted approximately two hours and was not electronically recorded.

According to deposition and trial testimony by detectives, Simmons first denied any involvement in the crime. At various times, detectives moved within a foot of Simmons' face and Detective Knoll raised his voice. The officers told Simmons that they thought he was lying. The detectives also suggested that Simmons' accomplice had been arrested and was possibly confessing at that moment.

---

[2]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

Eventually, Simmons asked everyone but Knoll to leave the room. Simmons then made a statement and agreed to repeat it while being videotaped. At the beginning of the videotape, Knoll showed Simmons the advice-of-rights form and confirmed that the form had been read to Simmons, that Simmons understood the form and had initialed and signed the Miranda waiver. Knoll then noted that the interrogation had been going on for approximately two hours, and the following exchange occurred:

> MR. KNOLL: During the time all of this [interrogation] has been going on, you first started off saying you didn't know nothing about this crime, and you didn't want to tell us anything. Is that correct?
>
> MR. SIMMONS: Yes.
>
> MR. KNOLL: Since that time, after we continued to interview with you, you changed your mind, and you were willing to tell us the truth on exactly what took place on the main element of this crime. Is that correct?
>
> MR. SIMMONS: Yes.

During the videotaped interview, Simmons implicated himself and Charles Benjamin in the murder of Shirley Crook. Law enforcement officers also videotaped a re-enactment by Simmons at the crime scene.

Before trial, defense counsel moved to suppress Simmons' statements and, during trial, objected to testimony regarding the statement. His motion was denied and the objection was overruled.

At trial, Detective Knoll testified to the content of the statement Simmons gave as a result of the September 10, 1993, interrogation and described Simmons' reenactment of the crime. His testimony demonstrates that in the early morning hours

-3-

of September 9, 1993, seventeen-year-old Christopher Simmons and fifteen-year-old Charles Benjamin entered the home of Shirley and Steven Crook to burglarize it. They opened a back window that had been left cracked open to accommodate a garden hose, reached through, unlocked the door, and entered the Crook home.

Once inside, Simmons turned on a hallway light, waking Mrs. Crook, who was home alone. Mrs. Crook sat up in bed and asked, "Who is there?" The two recognized one another from a traffic accident they had had in July of 1992. Simmons then entered her bedroom and ordered Mrs. Crook from her bed. When she did not comply he and Benjamin forced her to the floor. The two bound Mrs. Crook's hands behind her back, taped her eyes and mouth shut, and placed her in the back of her minivan. Simmons drove the van from Mrs. Crook's home in Jefferson County, Missouri, to a railroad trestle that spans the Meremac River in Castlewood State Park in St. Louis County, Missouri.

After Simmons parked the van near the trestle, he and Benjamin began to remove Mrs. Crook from the van and discovered that she had freed her hands and had removed some of the duct tape from her face. They then covered her head with a towel, securing it with her bathrobe belt, and restrained her hands with her purse strap and feet with electrical wire they found on the bridge. After walking her to the trestle, they bound her hands to her feet. Simmons then pushed her off the bridge into the Meremac River.

On redirect examination, Knoll testified that he did not know that Castlewood State Park existed or its location until Simmons led him there during the reenactment. Nor had he known other details of the murder that were later substantiated, such as that Shirley Crook's feet were bound with electrical cable, until Simmons told him during the interrogation.

-4-

The medical examiner testified that he identified Mrs. Crook's body from her fingerprints. He determined that the cause of her death was drowning and noted that she had been conscious prior to being pushed from the bridge. The examiner also reported that Mrs. Crook had sustained several fractured ribs and considerable bruising and that those injuries did not result from her fall from the railroad trestle.

Steven Crook, the victim's husband, testified that he was employed by a carrier service and had been making an overnight delivery on September 8, 1993. On the afternoon of September 9, 1993, upon discovering that his wife had not reported for work as she had planned, he returned home and found her missing. The bed clothes of their bed were in disarray, wads of duct tape were on the floor, and the couple's dog, Chrissy, was lying on the bed with her nose and legs tangled in duct tape and whimpering. Mr. Crook then contacted the police to report Shirley missing.

Friends of Simmons testified regarding statements Simmons had made prior to and after the murder. Christie Brooks testified that on the evening of September 8, 1993, Simmons told her he was planning to rob another house in the area–belonging to a man they had nicknamed "Voodoo"–on that night, and that Simmons had a ski mask, a dark button-up shirt with leather gloves taped to the sleeve, a small shotgun, and a large knife. He asked her for a gun because three people were to be involved and he only had two weapons.

Brian Moomey, another friend of Simmons, testified that prior to the murder, Simmons and Benjamin talked about robbing a house and killing a family, that Simmons told Benjamin that "they could do it and not get charged for it because they [were] juveniles, and nobody would think that juveniles would do it." Moomey also testified that, after the murder, Simmons bragged about killing a woman, that Moomey asked Simmons if he had killed the woman, and that Simmons said he had done so because she had seen his face.

John Tessmer testified that, on several occasions prior to the murder of Shirley Crook, Simmons talked to him about a plan to murder the "voodoo guy" by throwing him off a bridge in order to get "a bunch of money." Tessmer saw Simmons cutting masks from old sweatshirts and Simmons told him that the masks were for hiding their faces. Tessmer also testified that, while at Moomey's house, Simmons tried to persuade him to go along with the plan to kill someone by throwing the victim off the bridge and that "they'd never think that kids did it." On the evening of September 8, 1993, Simmons told Tessmer that he wanted to meet at Moomey's house at 2:00 a.m. In the early morning hours of September 9, Simmons and Benjamin met at Moomey's house. Tessmer went home.

The defense cross-examined the prosecution's witnesses at some length. In cross-examining Moomey and Tessmer, the defense highlighted their extensive criminal histories and their concerns that they may be suspects in the murder, and elicited inconsistencies between Moomey's trial testimony and statements he had previously made to law enforcement officials.

On June 16, 1994, in the Circuit Court of Jefferson County, a jury convicted Simmons of the first degree murder of Shirley Crook. During the penalty phase of the trial, members of Mrs. Crook's family presented victim impact statements. In his penalty phase closing arguments, the prosecutor commented on Simmons' age and what effect the jurors' choice of penalty would have on his family.

The jury found three statutory aggravating circumstances: (1) the murder was committed for the purpose of receiving money or any other thing of value; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest of the defendant; and (3) the murder involved depravity of mind, and as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. Tr. Trans. at 1163-64. Consequently, the jury imposed the death penalty.

The trial court entered judgment against Simmons and sentenced him to be executed in accordance with Missouri law.

Simmons sought post-conviction relief pursuant to Missouri Supreme Court Rule 29.15. After an evidentiary hearing, the court denied Simmons' Rule 29.15 motion. Simmons then appealed the conviction, death sentence, and denial of the Rule 29.15 motion to the Missouri Supreme Court. The Missouri Supreme Court affirmed.

Simmons then filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising fifteen grounds for relief, all of which the district court rejected. Although the district court issued a certificate of appealability on all fifteen claims, we quashed that certificate and granted a certificate on only three issues: (1) whether Simmons' confession was voluntary; (2) whether victim impact testimony was constitutionally improper; and (3) whether the prosecutor's closing arguments were constitutionally suspect.

## II. DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo. Tokar v. Bowersox, 198 F.3d 1039, 1045 (8th Cir. 1999). We apply a presumption of correctness to the state court's findings of fact. Id.; 28 U.S.C. § 2254(e)(1).

The Antiterrosim and Effective Death Penalty Act constrains the power of a federal habeas corpus court to grant a state prisoner's application for a writ of habeas corpus on claims adjudicated on the merits in state court. Williams v. Taylor, 120 S. Ct. 1479, 1523 (2000); 28 U.S.C. § 2254(d)(1). The writ may issue only if the state-court adjudication either results in a decision "'contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,'" or

-7-

"'involve[s] an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'" Williams, 120 S. Ct. at 1523 (quoting 28 U.S.C. § 2254(d)(1)) (omission in original).

Under the "contrary to" clause of section 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. A state court's decision must be "mutually opposed" to clearly established Supreme Court precedent in order to satisfy the "contrary to" clause. Id. at 1519-20.

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of" the case before it. Id. at 1523. Therefore, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 1522. The state court's application must also be unreasonable. Id. Whether a state court's application was unreasonable is an objective inquiry. Id. at 1521.

## A. Voluntariness of Defendant's Statement

Simmons argues that his confession was obtained in violation of the Constitution because: (1) detectives threatened to use Simmons' exercise of his right to remain silent against him; (2) detectives did not cease questioning him when he exercised his right to remain silent; (3) detectives promised him leniency to prompt his confession; and (4) because the totality of the circumstances rendered Simmons' confession involuntary. A state court's resolution of a factual question is entitled to a presumption of correctness, but a federal court must determine the ultimate legal

-8-

question of the voluntariness of a confession. Evans v. Dowd, 932 F.2d 739, 741 (8th Cir. 1991).

## 1. Threat to Use Defendant's Silence Against Him

In a deposition prior to trial, Knoll testified that, during the interrogation of Simmons, detectives "just told [Simmons] that if he chose to lie, which [Knoll] believed he was, not to tell the truth, that if it went to court then [Knoll] would get on the stand and . . . would testify that [Simmons] sat there during the whole interrogation, and denied his involvement in the case." Simmons argues that Knoll's statement constituted a threat to use his silence against him. The Missouri Supreme Court interpreted Knoll's statement not as a threat to use Simmons' silence against him, but instead as a threat to use his denial of involvement against him. We agree.

Prior to a custodial interrogation, law enforcement officers must warn the person that he "has the right to remain silent" and "that anything he says can be used against him in a court of law." Miranda v. Arizona, 384 U.S. 436, 479 (1966). In the present case, Simmons was read his rights under Miranda. Knoll did not improperly threaten Simmons by telling him that if Simmons chose to lie, Knoll would testify as to what he said. Knoll merely restated the consequences of which Miranda warns: that Simmons' statements of denial would be used against him. We reject the contention that use of statements of denial against a defendant would amount to use of a defendant's silence against him.

## 2. Assertion of the Right to Remain Silent

Once a person in custody has invoked his right to remain silent, law enforcement officers must scrupulously honor his assertion of that right. United States v. Cody, 114 F.3d 772, 775 (8th Cir. 1997) (construing Michigan v. Mosley, 423 U.S. 96, 104 (1975)). However, to invoke one's right to remain silent, one must

unequivocally express his desire to remain silent. United States v. Al-Muqsit, 191 F.3d 928, 936 (8th Cir. 1999). An assertion of one's Miranda rights must be neither ambiguous nor equivocal. See Davis v. United States, 512 U.S. 452, 459 (1994) (applying this standard in determining whether a suspect had invoked his right to counsel). To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are considered as a whole. United States v. Johnson, 56 F.3d 947, 955 (8th Cir. 1995). A denial of knowledge does not constitute an assertion of the right to remain silent. United States v. Turner, 551 F.2d 780, 782 (8th Cir. 1977). More specifically, even statements by a juvenile that "he did not know the answer to a question put to him or that he could not, or would not, answer the question . . . [are] not assertions of his right to remain silent." Fare v. Michael C., 442 U.S. 707, 727 (1979).

In this case, Simmons failed to unambiguously or unequivocally assert his right to remain silent. In its analysis, the Missouri Supreme Court relied in part on Knoll's trial testimony that Simmons had not sought to terminate the questioning. Yet Simmons focused the court's attention on the beginning of Simmons' videotaped statement where Knoll stated, "During the time all of this [interrogation] has been going on, you first started off saying you didn't know nothing about this crime, and you didn't want to tell us anything." The Missouri Supreme Court found that, "[r]ead in context, Detective Knoll's statement refers to Simmons' initial denial of involvement in the crime, not any assertion of the Fifth Amendment right to remain silent." State v. Simmons, 944 S.W.2d 165, 174 (Mo. 1997) (en banc).

We have reviewed the record and the videotaped interrogation, and we agree with the state court's assessment. Although Simmons' statements, as summarized by Knoll, are arguably susceptible to different interpretations, read in context, it is more plausible to interpret them as a denial of involvement than as an assertion of the right

-10-

to remain silent.  There has been no showing that Simmons ever clearly expressed his right to remain silent.  Therefore, we find no error.[3]

### 3.  Promises of Leniency and the Totality of the Circumstances

Simmons argues that he was impermissibly promised leniency in exchange for his statement and that his statement was involuntary under the totality of the circumstances. We consider these arguments together as the analysis of one informs that of the other. United States v. Larry, 126 F.3d 1077, 1079 (8th Cir. 1997). Simmons argues that circumstances surrounding the interrogation rendered his

---

[3]To say that a person must clearly and consistently assert his desire to remain silent, see United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989), does not mean that he must repeat his clearly asserted desire to remain silent in order to halt continued questioning.  See Smith v. Illinois, 469 U.S. 91, 97-99 (1984) (finding that courts may not construe a defendant's assertion of Miranda rights to be ambiguous by looking only to subsequent responses to police questioning).  We merely find that the state court did not clearly err in its determination that Simmons never clearly expressed his desire to remain silent. Also, we find it appropriate to "add a note of caution" that:

> [W]here a suspect makes a statement which arguably amounts to an
> assertion of his Miranda rights and the interrogating agent recognizes
> that the statement is susceptible of that construction, his questioning
> with regard to the crime he is investigating should immediately cease
> and he should then inquire of the suspect as to the correct interpretation
> of the statement.  Only if the suspect makes clear that he is not invoking
> his Miranda rights should substantive questioning be resumed.

United States v. Riggs, 537 F.2d 1219, 1222 (4th Cir. 1976) (footnote omitted); see also Davis, 512 U.S. at 461 (suggesting that "when a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify" whether the suspect is indeed asserting his Miranda rights).

statement involuntary. In support of his contention, he relies on the following: he was seventeen years old at the time; he was a poor student of below average intelligence; he was interrogated by three police officers for over two hours; law enforcement officials raised their voices while in close proximity to him, misrepresented to him that his accomplice was confessing, and reminded him that he was facing the death penalty while also telling him things would go better for him if he told the truth.

We have carefully reviewed Simmons' videotaped statement to police, along with transcripts of pretrial hearings on its admissibility, depositions of law enforcement officials, and the trial transcript. We find Simmons' claim that his self-incriminating statement resulted from coercive activity is without merit. On videotape, Simmons acknowledged that his rights had been read to him and that he understood those rights but chose not to exercise them. He also acknowledged that he voluntarily chose to speak to law enforcement officials. Law enforcement officials testified that Simmons was read his Miranda rights before the officials began questioning him. Although the requirement that a Miranda warning be given does not dispense with the voluntariness inquiry, "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare.'" Dickerson v. United States, __ U.S. __, 120 S. Ct. 2326, 2336 (2000) (quoting Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984)).

To merit habeas corpus relief, Simmons must prove he involuntarily made his statement to law enforcement officials. Jenner v. Smith, 982 F.2d 329, 333 (8th Cir. 1993). A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination. United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998). In applying this test, we look at the totality of the circumstances surrounding the interrogation, including law enforcement officials' conduct and the

-12-

defendant's capacity to resist any pressure. Id. Specifically, we consider factors such as detention length, the repetitive and prolonged nature of questioning, and the accused's age. Bramlett v. Lockhart, 876 F.2d 644, 646 (8th Cir. 1989).

We find that the questioning tactics in the present case were not improperly coercive. Officers may elicit statements by claiming not to believe the accused's denials. Jenner, 982 F.2d at 334. Tactics such as deception and raised voices do not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne. Id. Questioning a suspect for six or seven hours is not unconstitutionally coercive per se. Id. We do not find the period of interrogation in the present case–approximately two hours–to be particularly lengthy. Cf. id. Furthermore, although it may have taken up to two hours for Simmons to make a statement implicating himself in the murder of Mrs. Crook, he waived his rights at the beginning of questioning and did not later assert them.

Although a promise made by law enforcement is a relevant consideration in assessing police conduct, it is only one circumstance to be considered and does not render a confession involuntary per se. Larry, 126 F.3d at 1079; United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (indicating that even if the suspect had been promised some form of leniency, this circumstance alone would not render his confession involuntary). The statement to an accused that telling the truth "would be better for him" does not constitute an implied or express promise of leniency for the purpose of rendering his confession involuntary. Bolder v. Armontrout, 921 F.2d 1359, 1366 (8th Cir. 1990) (involving penalty of death); see, e.g., Pierce, 152 F.3d at 813 (statement that it would be to the suspect's benefit if he cooperated with them is not improperly coercive); Bannister v. Armontrout, 4 F.3d 1434, 1440 (8th Cir. 1993) (comments that it would be in the accused's best interest to cooperate did not render his statement involuntary in death penalty case). Furthermore, "[a] truthful and noncoercive statement of the possible penalties which an accused faces may be given

to the accused without overbearing one's free will," even when the accused is a minor. United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978).

In the present case, the Missouri Supreme Court determined that, during the interrogation, Lt. Edward Robertson stepped into the room and told Simmons that he "was facing either the death penalty or life in prison and that it would be in his 'best interest' to tell the truth." Simmons, 944 S.W.2d at 173. After Robertson exited, "Knoll and the other detectives encouraged Simmons to remember what Robertson had said and that it would be better for him to tell the truth." Id. Simmons argues that, together, the statements constituted an implied promise of leniency. We agree with the state court, which found "this supposed nexus far too tenuous to support Simmons' contentions." Id. at 175.

We recognize that courts have a duty to scrutinize juveniles' statements with special care. Rone v. Wyrick, 764 F.2d 532, 534-35 (8th Cir. 1985) (citing Haley v. Ohio, 332 U.S. 596, 599 (1984)). Statements by an accused juvenile must not be the product of "'ignorance of rights or of adolescent fantasy, fright or despair'" in addition to not being coerced or suggested. Id. at 534 (quoting In re Gault, 387 U.S. 1, 55 (1967)). Factors to consider in the totality-of-the-circumstances analysis involving a juvenile include the juvenile's intelligence, maturity, and prior dealings with law enforcement. Id. at 535.

Considering those factors, we cannot find that Simmons' will was overborne by police tactics. Particularly compelling to us is Simmons' acknowledgment, on videotape, that he understood his rights and agreed that he had not been coerced by police officials. In the post-conviction relief proceedings, Dr. Daniel Cuneo–who had been hired by defense counsel prior to trial to investigate possible mitigating factors–testified that Simmons has a full-scale IQ of 88 and that he "was bright

-14-

enough to do well in school if he had wanted. It wouldn't have been easy, but he could have done it." One of Simmons' defense attorneys testified in the post-conviction relief proceedings that Simmons had previously been arrested as a suspect in a rape case. Simmons, therefore, was not unfamiliar with the criminal legal process.

The facts of this case are less compelling than those presented in Sumpter v. Nix, 863 F.2d 563 (8th Cir. 1988), where a special agent interrogated a suspect with an IQ of 89 for seven and one-half hours, suggested that the suspect's wife would understand what had happened, and made implied promises of leniency and treatment for alcoholism if the suspect were to confess. Id. at 564-65. We concluded that the suspect's will had not been overborne nor his capacity for self-determination critically impaired. Id. at 565. Simmons has similarly failed to show that his will was overborne and his capacity for self determination critically impaired. Law enforcement officials followed the dictates of Miranda and our totality-of-the-circumstances analysis convinces us that his waiver of rights and confession were not involuntary. His confession, therefore, satisfies constitutional scrutiny.

## B. Victim Impact Testimony

Simmons asserts that penalty-phase testimony by Shirley Crook's family[4]

_____

[4]Testimony of the victim's husband, Steven Crook, included:

But she was terrificly [sic] scared of height. It terrifies me to think of her being blindfolded and knowing that she was–because I feel that they would have talked about where they were going, and to be thrown off of a high spot would be really a terrible thing for her to–and then how she would feel about not being home when I come home. I know that as much pain as she would have been going through, I know she would have been worried about me, and worried about Kim and Randy and her mother. Her mother was ill.

Mrs. Crook's daughter testified:

Like I said, I have dreams. I dream about how she–how I imagine she felt during all of this, what she thought. I can't imagine what she went through, the terror that she felt. I just–I have a picture in my mind that she can't see, she can't speak, she can't scream out, she can't get her hands on anybody, she's tied up, she's naked. You know, she never wanted to be unclothed. It just tore her down emotionally. Threw her in a van. I just imagine–I can imagine her feelings–you know–I can imagine that–I'm sure they were talking.

I can imagine that she was being pushed over, and the freeness of the air. There's nothing below you, there's nothing holding you up. I can't imagine the terror that she's thinking, what's happening, what's going on, I can't see anything. Then I imagine her hitting the water. Does she know to take a breath? Does she know that's what was going to happen. Then you hit the water, and then you go in. And then if she had a breath that she held, how long could she hold it? Did it hurt? When the water came in, did it hurt?

The victim's sister read a prayer in her penalty phase testimony:

-16-

constituted characterizations and opinions and, as such, were inadmissible under the Eighth Amendment and the Due Process Clause.

During the sentencing phase, the state may offer evidence on personal characteristics of the victim and the emotional impact of a crime on the victim's family. Payne v. Tennessee, 501 U.S. 808, 827 (1991); cf. id. at 833 (O'Connor, J., concurring) (indicating that the Court did not reach the issue of whether the family's opinions about the crime, the defendant, or the appropriate sentence are admissible). The Eighth Amendment does not bar, per se, relevant victim impact evidence or prosecutorial argument on the subject. Id. at 827. Evidence relating to the victim is often already before the jury, at least in part, because of its relevance during the guilt phase of the trial. Id. at 823. But even new relevant evidence may be admitted during the sentencing phase for the fact-finder to weigh. Id. Admission of victim impact evidence is limited only by the Due Process Clause of the Fourteenth Amendment in that such evidence may not be "so unduly prejudicial that it renders the trial fundamentally unfair." Id. at 825.

---

"Dear God, we come together to remember, to celebrate and give thanks. You have given us the gift of each other, and the love we share that you have planted in our hearts. By your gracious hand, we have received all that we have for our love and our hope and faith. We are grateful. We humbly ask you to grant your special graces to our family. May our homes be a place of peace and love and faith. We ask you, Dear God, to protect and bless all of us, absent and present, living and dead." We wanted to put something in there that would kind of say Shirley without saying her name. "Please bless this food, and bless us who are gathered here. In the name of Jesus, Amen."

The victim impact evidence at issue in the present case is not meaningfully distinguishable from that approved by the Supreme Court in <u>Payne</u>.[5] Here, as in <u>Payne</u>, the jury was unavoidably familiar with the facts of the murder of Shirley Crook. Based on the evidence presented during the guilt phase, the victim's family added very little, if anything, to images of the murder that had already been planted in the jurors' minds. The jury was free to weigh the victim impact testimony against other testimony. The victim impact testimony of Shirley Crook's husband, daughter, and sister was no more inflammatory than the poignant testimony the Court found to have been properly admitted in <u>Payne</u>. In <u>Payne</u>, the prosecutor and victim's mother gave voice to the impact on the victim's child, while in the present case, the victim's

_____

[5]In <u>Payne</u>, the victim's mother testified during the penalty phase about how the murder of her daughter and granddaughter affected the daughter's three-year-old son, Nicholas:

> "He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister Lacie. He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell him yes. He says, I'm worried about my Lacie."

<u>Payne</u>, 501 U.S. at 814-15 (quoting trial testimony). In his penalty phase closing argument, the prosecutor stated:

> "But we do know that Nicholas was alive. And Nicholas was in the same room. Nicholas was still conscious. His eyes were open. . . . He was able to hold his intestines in as he was carried to the ambulance. So he knew what happened to his mother and baby sister."

<u>Id.</u> at 815. In her concurring opinion, Justice O'Connor indicated that "[i]n light of the jury's unavoidable familiarity with the facts" of the murder, victim impact testimony "did not inflame [the jury's] passion more than did the facts of the crime," and therefore did not deprive the petitioner of due process. <u>Id.</u> at 832 (O'Connor, J., concurring).

-18-

family members themselves spoke of the images that haunted them, the loss they suffered, and the coping mechanisms on which they relied.

Given the evidence that had already been presented to the jury, we cannot say that admission of the victim impact testimony by Mrs. Crook's family was so unduly prejudicial that it rendered the trial fundamentally unfair. Nor can we say that the testimony was either contrary to or unreasonably applied clearly established Supreme Court precedent. We, therefore, find the trial court committed no error in admitting the victim impact testimony.

## C.  Prosecutor's Penalty-Phase Closing

Simmons further argues that the prosecutor's penalty-phase closing argument deprived him of his constitutional rights. Specifically, he takes issue with comments that jurors should impose the death penalty for the benefit of his family and that his young age should not dissuade the jury from imposing the death penalty.[6] His claim

---

[6]The prosecutor argued:

Does the defendant's age outweigh what he did?  It doesn't matter if he was seventeen, twenty-seven, or seventy, the crime is still the same, and it's just as vicious.

As I told you yesterday, he used his age in committing this offense because he didn't believe that you would think that he was capable of it. Well, you do, and you have found it.  Don't let him use his age to protect himself now, because then he wins.

In response to defense counsel's closing, the prosecutor argued:

Let's look at the mitigating circumstances.  Let's look at that.  He listed the mitigating circumstances. I don't have them in front of me here. Age, he says.  Think about age.  Seventeen years old.  Isn't that scary?

regarding the prosecutor's closing arguments presents both Eighth Amendment and due process issues.[7]

The Eighth Amendment imposes a heightened need for "'the responsible and reliable exercise of sentencing discretion' in capital cases" and, therefore, a prosecutor's closing argument must not diminish the jury's sense of responsibility in imposing the death penalty. Antwine v. Delo, 54 F.3d 1357, 1362 (8th Cir. 1995) (quoting Caldwell v. Mississippi, 472 U.S. 320, 329 (1985)). "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell, 472 U.S. at 328-29. In Antwine, the prosecutor's unfounded assurance that the defendant would be put to death

---

> Doesn't that scare you? Mitigating? Quite the contrary I submit. Quite the contrary.

The prosecutor also argued:

> Look at what [defendant's] friends and family told you. Isn't that scary? Look at how he repaid their love. Look at what he's done to them, and they're asking you to spare his life so he can remain in prison as a constant reminder to them of the acts he did on that night. Show some mercy to his family, give him death. Look at his family. Look at his little brother. [His little brother] said it all. Someday I want to grow up to be just like him. To be just like him. Spare those kids of that.

[7]Simmons also contends that, to the extent that defense counsel failed to object to improper closing arguments, he received ineffective assistance of counsel under the Sixth Amendment. To succeed on an ineffective assistance of counsel claim, one must show that defense counsel's actions were (1) outside the wide range of professionally competent assistance and (2) prejudicial to the defense in that the defendant was deprived of a fair trial whose result is reliable. Seehan v. Iowa, 72 F.3d 607, 608 (8th Cir. 1995). Here, defense counsel's actions were not outside the range of professionally competent assistance.

instantaneously diminished the jury's sense of responsibility and undermined the Eighth Amendment's heightened requirement of reliability. Antwine, 54 F.3d at 1361, 1363. Similarly, in Caldwell, the prosecutor improperly urged the jury to believe that, if it imposed the death penalty, it would not actually be responsible for determining whether the defendant would die because a death sentence would ultimately be reviewed for correctness by an appellate court. Caldwell, 472 U.S. at 323. The prosecutor, thereby, undermined the responsible and reliable exercise of sentencing discretion in violation of the Eighth Amendment. Id. at 328-29.

In the present case, although we find the prosecutor's closing sprinkled with improper comments,[8] the prosecutor's remarks did not diminish the jury's sense of responsibility. Unlike the comments made by prosecutors in Antwine and Caldwell, here, the prosecutor's closing argument did not dilute the gravity of a death sentence or place the responsibility of imposing a capital sentence in hands other than those of the jurors. We find that the district court did not err in rejecting Simmons' Eighth Amendment claim.

Simmons also asserts that the improper comments violated his due process rights. Under due process analysis, it is not enough that a prosecutor's remarks were undesirable or even universally condemned, but they must have so infected the hearing with unfairness so as to deny the defendant of due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986) (addressing closing arguments during the guilt-innocence phase of the trial). Not only must the prosecutor's comments be improper, they must also be prejudicial. Therefore, upon finding that a prosecutor has made improper comments in his closing argument, we: (1) measure the type of prejudice emanating from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to determine if the jury was properly instructed; and (4) determine if there is a reasonable probability that

---

[8]See ante n.6.

the outcome of the sentencing phase would have been different in light of all the aggravating and mitigating circumstances. <u>Antwine</u>, 54 F.3d at 1363.

In the present case, the prosecutor's comments that jurors should "show some mercy to [Simmons'] family [and] give him death" are analogous to those we condemned in <u>Antwine</u>.[9] On cross-examination during the penalty phase, the prosecution elicited testimony from Simmons' ten-year-old brother that he looked up to his brother.[10] We find improper, not to mention illogical, the prosecutor's suggestion that the jury should impose the death penalty to "[s]pare those kids" of growing up to be like Simmons. We admonish the prosecutor to consider the implications of placing the burden of an execution on the shoulders of a child, even if that burden exists only in the child's mind or in prosecutorial rhetoric. Reiterating what we said in <u>Antwine</u>, such comments have "no place in an American courtroom."

---

[9]In <u>Antwine</u>, the prosecutor's improper arguments included the following:

"[I]sn't it much more humane to sentence this man to death so that his brother can get on with his life, and so that the two children can get on with their lives, instead of having to think, every day for the next 50 years, they have a brother or a father locked up in the penitentiary?"

<u>Antwine</u>, 54 F.3d at 1362-63 (quoting trial transcript).

[10]The prosecutor's exchange with the child went as follows:

Q     You love Chris, don't you?

A     Yes.

Q     Want to be like him some day?

A     Yes.

54 F.3d at 1363. There is "'no legal or ethical justification for imposing the death penalty on this basis and it is not a proper factor to be considered by the jury, for it does not reflect the properly considered circumstances of the crime or the character of the individual.'" Id. at 1364 (quoting Blair v. Armontrout, 916 F.2d 1310, 1323 (8th Cir. 1990)).

Likewise, we condemn the prosecution for teetering on the edge of misstating the law with regard to the significance of Simmons' age as a mitigating factor. Both the Eighth and Fourteenth Amendments prohibit precluding considering age as a mitigating factor, and the chronological age of a minor is a "relevant mitigating factor of great weight." Eddings v. Oklahoma, 455 U.S. 104, 110, 116 (1982). With that said, we recognize that the sentencer ultimately determines the weight to be given relevant mitigating evidence and is merely prohibited from giving it no weight by excluding it from consideration. Id. at 114-15. In Eddings, the trial and appellate courts refused to consider certain mitigating circumstances. Id. In contrast, jurors in the present case were not precluded from considering Simmons' age and, therefore, the prosecutor's comments did not violate the Eighth Amendment. They were, however, improper.

Although we find the prosecution's statements to be improper, we are unable to find that the offending comments prejudiced Simmons. First, with regard to the type of prejudice, the prosecutor's comments were not so egregious that they would "undermine the jury's sense of responsibility and its individualized consideration of the defendant." Antwine, 54 F.3d at 1364. Nor were they combined with comments already determined to violate the Constitution, as was the case with comments regarding the defendant's family in Antwine. Id. The prosecution's arguments regarding the defendant's youthful age addressed the weight of that mitigating circumstance but did not preclude the jury from considering it. In addition, during the guilt phase, witnesses testified that Simmons had included his youth in his risk calculations prior to killing Mrs. Crook, thus bringing age into play for the purpose

-23-

of closing argument. The prosecutor's comments about Simmons' age were of the same tenor as the properly presented evidence. Furthermore, unlike Antwine, in the present case there is no Eighth Amendment violation to "bolster a finding of a due-process violation." Id.; see also Newlon v. Armontrout, 885 F.2d 1328, 1337 (8th Cir. 1989).

Second, although defense counsel did not object to the prosecution's arguments, he made significant efforts to minimize prejudice the comments may have caused. Counsel focused a substantial portion of his closing argument on stressing that Simmons' youth "should make a huge difference" in the jury's decision-making process and specifically addressed the prosecutor's age-related arguments. With regard to the prosecution's comments to spare Simmons' family by imposing the death penalty, we look at the defense counsel's opening summation to determine the effect of the comments on the sentencing as a whole. See Darden, 477 U.S. at 182 (addressing the prosecutor's closing argument during the guilt stage). Albeit unartfully, the prosecutor was responding to the defense counsel's plea to the jury to "give [Simmons] a life sentence for his family['s benefit]." Furthermore, although the prosecutor's argument that jurors would be showing mercy to Simmons' family by sentencing him to death is illogical, defense counsel further undermined the argument by presenting testimony by Simmons' family that clearly demonstrated imposing the death penalty on their loved one would not amount to showing them mercy. Defense counsel's presentation of testimony favorable to Simmons by family members themselves, his persistent appeal to jurors' consciences, as well as his concentration on jury instructions favorable to Simmons, effectively countered any prejudice the prosecutor's comments may have caused.

Third, the jury was properly instructed that it was free to consider age as a mitigating factor, that the attorneys' arguments were not evidence, and that the jury should govern its deliberations based on the laws provided in the instructions, the evidence, and reasonable inferences drawn therefrom. The jury instructions explicitly

limited the aggravating circumstances the jury could consider. The jury was also instructed that it was "not compelled to fix death as the punishment even if [jurors did] not find the existence of one or more mitigating circumstances sufficient to outweigh the aggravating circumstances which [it] found to exist." Defense counsel vigorously stressed that the jury should apply the mitigating factors to Simmons' benefit.

Finally, taking into consideration the aggravating and mitigating circumstances, we find no reasonable probability that the outcome of the sentencing phase would have been different had the prosecution not made its improper comments. See Preston v. Delo, 100 F.3d 596, 602 (8th Cir. 1996) (disapproving of the prosecutor's argument as "mean-spirited and unnecessary," but concluding that the comments presented no reasonable probability that the statement more than minimally affected the outcome of the sentencing phase). The trial court limited the aggravating circumstances the jury could consider to four. The jury found three of those statutorily-defined aggravating circumstances.[11] It gave no indication that it considered Simmons' age or the effects on his family as aggravating circumstances. It was given wide latitude to sentence Simmons to life even if it found no mitigating circumstances. Looking at the sentencing phase as a whole, we do not find it reasonably probable that the jury would have decided to impose a life sentence rather than death but for the prosecutor's improper comments.[12]

---

[11]We note that the jury demonstrated it took seriously the instruction that argument is not evidence when it ignored the prosecution's contention that all four aggravating circumstances had already been proven in the guilt phase.

[12]Simmons mentions the prosecutor's urging the jury to send a message to the community and also asserts that the prosecutor commented on his right to remain silent. With reference to the former, while we have said that such comments are improper, they do not always render a trial fundamentally unfair. Sublett v. Dormire, 217 F.3d 598, 601 (8th Cir. 2000). Our reasoning concerning the prosecutor's other comments applies equally here. As to Simmons' latter assertion, we agree with the

-25-

We cannot say that the prosecutor's closing arguments at the sentencing stage of the trial rendered Simmons' sentence fundamentally unfair or deprived him of the reliability the Eighth Amendment requires.

## III.   CONCLUSION

Accordingly, the order of the district court dismissing the petition is affirmed.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

district court and Missouri Supreme Court that, "[r]ead in context, the prosecutor's statement [that Simmons chose the penalty-phase evidence the jury would hear] reflects a belief that Simmons chose to murder Shirley Crook and to do so in the manner in which he did," Simmons, 944 S.W.2d at 190, and was not intended to call attention to Simmons' failure to testify. Horne v. Trickey, 895 F.2d 497, 500 (8th Cir. 1990). Nor was it one that the jury would naturally take as a comment on Simmons not testifying. Id.