# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1323

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Randal A. Hanson, also known as | * | |
| Randy Hanson, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: October 17, 2000

Filed: January 29, 2001

_____

Before BEAM, HEANEY and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

HEANEY, Circuit Judge.

On April 4, 1998, appellant Randal Hanson broke into the Fargo Women's Health Organization and attempted to start a fire in the clinic with the use of kerosene. Hanson was later convicted of violating 18 U.S.C. § 844(i) (1998), attempted arson of a property used in interstate commerce. He has been in federal prison since October 5, 1999. The issues before us are whether Hanson was in custody when he was interrogated by federal agents about the attempted arson, and whether the trial judge erred in failing to instruct the jury on a lesser included offense. We hold that Hanson

was in custody, and reverse his conviction because his confession is inadmissible against him. For that reason we need not reach the second issue.

## I. BACKGROUND

On December 10, 1998, the Fargo Office of the Bureau of Alcohol, Tobacco, and Firearms received an anonymous letter stating that Hanson had been seen cleaning blood off the sidewalk near the clinic on the morning of April 5, 1998. On January 15, 1999, federal agents Erickson and Rutter went to Hanson's residence. The agents explained that they were investigating recent vandalism at the abortion clinic and wanted to show Hanson photos of the clinic. The agents did not tell Hanson that he was the prime suspect in their investigation of the arson attempt that had occurred eight months earlier.[1] Hanson agreed to accompany them to the field office, apparently out of curiosity.[2] He rode in the locked back seat of the agents' government vehicle[3] to the federal building, and into the underground parking garage. They walked through an interior stairwell to an isolated room measuring six feet by eight feet,[4] where the agents questioned Hanson for approximately two hours. He was with the agents for at least three hours in total.[5] There is no video or audio record of their conversation.

---

[1]Suppression Hearing Transcript at 30-31.

[2]Randal A. Hanson's Affidavit, p. 30 of the Designated Record.

[3]There is no dispute in the record as to whether the back seat door was locked. The only variance in the record is whether it was locked by a child safety mechanism or an automatic lock that activated once the vehicle was in gear. (Suppression Hearing Transcript at 35, 72, 78.)

[4]Jury Trial Transcript, vol. II, at 24-25.

[5]Suppression Hearing Transcript at 54-55; Jury Trial Transcript, vol. I, at 96.

Hanson argues that he was entitled to <u>Miranda</u> warnings when the agents questioned him in the field station because he was in custody at that time. The United States argues that Hanson was not in custody and that his statements to the agents are admissible.

## II. DISCUSSION

We review the district court's conclusions concerning custody under the "clearly erroneous" standard. <u>United States v. McKinney</u>, 88 F.3d 551, 553 (8th Cir. 1996) (citing <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990)). We must affirm unless the district court's opinion is unsupported by substantial evidence, is an erroneous interpretation of applicable law, or the court is left with "a firm and definite conviction that a mistake has been made." <u>United States v. Jorgensen</u>, 871 F.2d 725, 728 (8th Cir. 1989).

<u>Miranda v. Arizona</u>, 384 U.S. 436, 444-45 (1966) established that a person "must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time that a person is taken into custody for questioning." <u>Griffin</u>, 922 F.2d at 1347. Custody occurs not only upon formal arrest, but also under any other circumstances where the suspect is deprived of his freedom of movement. <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983); <u>McKinney</u>, 88 F.3d at 554 (citation omitted). In determining whether a suspect is in custody we must consider the "totality of the circumstances," <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985), and "how a reasonable man in the suspect's position would have understood his situation." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 442 (1984). Ultimately, however, the determination of custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." <u>Stansbury v. California</u>, 511 U.S. 318, 323 (1994).

We will consider the following relevant factors in determining whether Hanson was in custody while he was interrogated: the length of the interrogation, the suspect's freedom to leave the scene, and the place and purpose of the interrogation. McKinney, 88 F.3d at 554. Griffin also identifies factors that are "indicia of custody:"

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive strategems were employed during questioning; (5) whether the atmosphere of questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of questioning.

Griffin, 922 F.2d at 1349.

In this case, Hanson agreed to go with the agents away from the familiarity of his home to the field station to look at photos of "recent vandalism" at the clinic; he did not know at the time of his consent that the agents were going to question him about the arson attempt, and therefore did not "voluntarily acquiesce" to the subsequent interrogation. The United States asserts that this was merely "subtle subterfuge." We find that it was "deceptive strategem," and the first of a series of the agents' coercive tactics that indicate that Hanson was in custody.

Once in the interrogation room, a six foot by eight foot space shut off from the rest of the office by two closed doors,[6] agent Erickson sat across from Hanson at a

---

[6]Suppression Hearing Transcript at 39, 85.

desk, and agent Rutter stood in the corner,[7] creating a police-dominated, intimidating environment. The agents informed Hanson that he was a suspect in the attempted arson investigation, that he was not under arrest, and that he was free to leave. The agents then explained that they would drive him home if he so wished. According to the appellant, Agent Erickson added, "[l]et's not make this adversarial tit for tat. If you don't cooperate I guarantee you'll do federal time in prison . . . . We have enough to arrest you but we're not. We know you did it. What we want to know is why." The agent denied making the statement.[8]

The district court, in its pre-written bench opinion, stated, "[t]he one statement by the defendant that he would go to federal prison if he would not cooperate alone is not enough to find Defendant's confession was involuntary and he was deprived of his ability to make an unconstrained decision to confess."[9] At the very least, this is a finding by the district court that the threat was not sufficient to find the appellant's confession involuntary. That begs the question, however, as to whether the threat, combined with the other circumstances outlined herein, required a finding that the confession was involuntary. We think that it did.

For the following two hours the agents asked Hanson about the attempted arson, and he described how he had vandalized the clinic eight months earlier by breaking the window. Not once during the interrogation, even after Hanson offered self-incriminating statements, did the agents mention his right to counsel. Stansbury held that "an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry." 511 U.S. at 324. The Court further explained, however, that "[a]n

---

[7]Id. at 84.

[8]Suppression hearing transcript at 41, 46.

[9]Appendix to appellant's brief at 114.

officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned . . . . Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" Id. at 325. In this case, the federal agents confirmed their suspicions about Hanson at the outset of the questioning, yet they kept him in an isolated office for hours, and threatened time in federal prison if Hanson did not cooperate, diminishing Hanson's sense of freedom of action. At the end of the interrogation agent Erickson asked whether Hanson would write a sworn statement. Only after Hanson had orally confessed to the attempted arson and agreed to reduce his confession to writing did agent Erickson read him the Miranda warnings.

The government cites Oregon v. Mathiason for the proposition that officers are required to administer Miranda warnings "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" 429 U.S. 492, 495 (1977). In that case an officer left his card at the burglary suspect's home twenty five days after the crime with a note asking Mathiason to call because he wanted to "discuss something with [him]." The following day Mathiason voluntarily called the officer and agreed to meet him at the state patrol office later that day. He walked two blocks from his apartment to the office at 5:00 p.m., met the officer in the hallway, and was informed that he was not under arrest. In a closed room the officer advised Mathiason that he was a suspect in the burglary, and falsely stated that his fingerprints were found at the scene. Within five minutes Mathiason stated that he had taken the property. Id. at 493. The officer advised him of his Miranda rights and taped the confession. Mathiason left the office at 5:30 and walked home. Id. at 494. The Supreme Court determined that Mathiason was not in custody when he confessed to the burglary because his "freedom to depart" was not restricted in any way. "He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview respondent did in fact leave the police station without hindrance." Id. at 495.

In this case, the agents appeared at Hanson's door eight months after the arson attempt, awakened him, and asked him to accompany them to the field station in their vehicle to look at photos. Hanson did not initiate contact with the agents as Mathiason had done. He traveled to the field station in the locked back seat of the government truck. Once in the isolated office in the field station, Hanson was told that he was a suspect in the arson attempt, that he was not under arrest, and that he was free to leave. Unlike Mathiason, however, Hanson was dependent upon the agents to find his way out of the building and back to his home. Hanson was with the agents for three hours, significantly longer than the thirty minutes that Mathiason spent with the officer in that case. The agents wanted a confession from Hanson, and it appears that they deliberately waited until they had the suspect in an intimidating environment before they advised him of their true purpose for bringing him to the station. Hanson could not have believed that he was free to leave.

It appears to us that there was a restraint on Hanson's freedom of movement. A reasonable person in Hanson's position would not have believed that he was free to the leave the field office unhindered by the agents. See Berkemer, 468 U.S. at 442. Upon consideration of the totality of the circumstances, we find that substantial evidence and law support the finding that Hanson was in custody when the agents questioned him, and that he should have received the Miranda warnings. Accordingly, Hanson's confession must be suppressed and his conviction is reversed.

BEAM, Circuit Judge, concurring.

I agree with much of the factual analysis contained in Judge Arnold's dissent. I do, however, believe, under the totality of the evidence, that Mr. Hanson was in custody at the time of the interrogation. Accordingly, I concur in the result reached by Judge Heaney in his opinion for the court.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

In deciding that Mr. Hanson was in custody for *Miranda* purposes, Judge Heaney recites as predicate a number of facts that the district court did not find, some of which were disputed even at the suppression hearing. Because my disagreements with Judge Heaney's fact-finding are numerous and significant, I set them out in some detail.

1. Judge Heaney states as a fact that the room in which Mr. Hanson's interrogation took place measured six feet by eight feet. In the first place, the only testimony to this effect occurred at Mr. Hanson's trial, not at the suppression hearing, so the district court can hardly be faulted for denying the suppression motion when the testimony on which Judge Heaney now relies was not even before it. Just as important, the testimony on the size of the room was offered by Mr. Hanson himself, hardly a disinterested source, and that testimony was not corroborated. There is no finding in the record as to the size of the room, and Judge Heaney simply accepts a defendant's own testimony as fact. This is of course entirely unwarranted. Can it be clearly erroneous not to believe a defendant's testimony? Finally, it strains credulity to believe that it is possible to get three people, a table, and at least two chairs (perhaps three) in a room six feet by eight feet.

2. Judge Heaney states as a fact that during the interrogation "Agent Erickson sat across from Hanson at a desk, and Agent Rutter stood in the corner, creating a police-dominated, intimidating environment." Judge Heaney has simply taken the defendant at his word again, and, in fact, there was testimony from the agents that Mr. Rutter was not standing but was sitting on the other side of the table from the defendant.

3. Judge Heaney seems to think that the district court found that the agents threatened Mr. Hanson with prison. There was no such finding, and the agents in fact

-8-

vigorously denied that they made any such statement. What the district court actually found was that Mr. Hanson said that he was threatened, not that he was in fact threatened. Judge Heaney again decides to believe Mr. Hanson's self-serving statement in the face of a forceful denial by the police.

4. Judge Heaney states as a fact that "[n]ot ever during the interrogation, even after Hanson offered self-incriminating statements, did the agents mention his right to counsel." That is untrue, as Mr. Hanson himself admits. After Mr. Hanson made his incriminating oral statement, the agents gave him the warnings that *Miranda* requires, and Mr. Hanson then gave a written statement, executed a consent form to have his blood tested, and submitted to having his fingerprints and palm prints taken. The court does not address the question of whether the written statement was admissible and whether the fingerprints, palm prints, and blood sample were not freely given or inevitably discoverable in any case.

There is, moreover, uncontroverted proof that cuts against Mr. Hanson's claim that he was in custody. When asked whether he felt that he "needed to go" to the federal building with the officers when they arrived at his home, he testified, "No, I was just curious." He admitted that he was not handcuffed, that there was no "cage" in the vehicle that transported him to the federal building, that the agents told him that he was not under arrest and was free to go, and even that he was not nervous during the interview.

Under the circumstances, I therefore cannot accede to the court's conclusion that Mr. Hanson was in custody when he made his oral statement. The fact that a mild sort of ruse was employed to get Mr. Hanson to accompany the officers to their office and that the interview occurred in a federal building is not enough, in my view, to support a conclusion that Mr. Hanson was in custody. The attempt to distinguish *Oregon v. Mathiason*, 429 U.S. 492 (1977) (*per curiam*), is, I think, wholly unsuccessful. Judge Heaney tries to distinguish that case from the present one partly on the ground that in

our case the agents awakened Mr. Hanson (not found as a fact by the district court and not admitted) and drove him to their office. Judge Heaney also says that Mr. Hanson was dependent on the agents to get back home, but the agents testified that they told him that they would take him back home if he wished, and the district court made no finding on the matter. Finally, the record reveals that Mr. Hanson spoke with the agents for no longer than half an hour before he made his oral confession. Our case is therefore on all fours with *Mathiason* in every relevant respect.

I therefore respectfully dissent from the judgment reversing the district court's order.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.