# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-4005

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Michael Edward LeBrun, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:   May 14, 2002

Filed:   October 3, 2002

_____

Before HANSEN, Chief Judge, MORRIS SHEPPARD ARNOLD, Circuit Judge, and
        PRATT,[1] District Judge.

_____

PRATT, District Judge.

_____

        [1]The Honorable Robert W. Pratt, United States District Judge for the Southern
District of Iowa, sitting by designation.

The United States of America appeals from the district court's[2] ruling suppressing all out-of-court statements made by Michael Edward LeBrun on September 21, 2000. We affirm the district court's ruling.

I.

In January 1968, Michael Edward LeBrun and United States Naval Ensign Andrew Muns were shipmates aboard the U.S.S. Cacapon, a Navy fueling vessel. Both men were assigned to work in the ship's disbursement office, an area where cash was kept in a safe for purposes of paying the ship's personnel. Sometime in the late evening hours of January 16, or in the early morning hours of January 17, 1968, while the ship was moored in Subic Bay, Philippines, Ensign Muns disappeared. Shortly after Muns' disappearance, approximately $8600 was found to be missing from the disbursement office. Naval investigators conducted an investigation and concluded that Muns had stolen the money from the disbursement office and deserted the Navy.

Having never believed the conclusion of the Navy, Muns' sister convinced Special Agent Peter Hughes of the Naval Criminal Investigative Service, Cold Case Homicide Unit (NCIS), to reopen the investigation in August 1998. On four separate days in November 1999, NCIS agents interviewed LeBrun concerning his involvement in Muns' disappearance. On the first occasion, November 17, 1999, Special Agent Hughes told LeBrun that he was conducting security clearance background investigations on people that LeBrun worked with in the military. He asked LeBrun to meet him at the Gardner, Kansas Police Department. Once there, Hughes informed LeBrun that the true purpose of the meeting was to discuss the disappearance of Muns. During the nearly five hour interview, LeBrun provided vague answers and agreed to submit to a polygraph examination. Two days later, on

---

[2] The Honorable H. Dean Whipple, United States District Judge for the Western District of Missouri.

November 19, 1999, LeBrun drove himself to the Kansas Bureau of Investigation to take a polygraph examination. Upon his arrival, LeBrun was informed of his Miranda rights pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). No polygraph examination was taken that day, but a four hour interview was conducted. LeBrun returned to the Kansas Bureau of Investigation on November 20, 1999, was again given his Miranda rights, and again consented to speak to investigators. On this occasion, he stated that he may have repressed memories regarding Muns' disappearance and asked Hughes if he knew of a therapist who could help him reveal the memories. Again, no polygraph examination was administered. On November 21, 1999, LeBrun met with investigators at the Olathe, Kansas Police Department. LeBrun was advised of his Miranda rights, executed a Civilian Suspect Acknowledgment and Waiver of Rights Form, and proceeded to participate in an interview with investigators. At the end of the interview, LeBrun indicated that he wanted to attempt to recover his repressed memories and suggested another interview in approximately three weeks. On December 16, 1999, Special Agent Hughes called LeBrun to inquire as to his progress. LeBrun relayed that he had not recovered any repressed memories since the last interview. Hughes had no further contact with LeBrun until after his confession on September 21, 2000.

In September 2000, Hughes and two other NCIS agents, Special Agents Early and Grebas, decided to talk to LeBrun again. The agents believed that LeBrun was the primary suspect in Muns' disappearance. Agent Hughes indicated that a significant amount of planning took place prior to the interview in an effort to make it as formal a process as possible. Agents planned in advance how LeBrun would be transported to the interview, who would conduct the interview, and whether or not the Miranda warnings would be read to him[3]. They also arranged to have enlarged

---

[3] The agents testified at the suppression hearing that they did not believe Miranda warnings would be required as they did not have probable cause to arrest LeBrun and because they did not believe the interrogation would be custodial in nature.

photos of LeBrun's family and house, the U.S.S. Cacapon and LeBrun's shipmates, and other scenes from LeBrun's life on the walls in the interview room.

On September 21, 2000, Special Agent Early and Corporal Hunter of the Missouri Highway Patrol drove to LeBrun's office, without prior notice, in plain clothes. Corporal Hunter identified himself to LeBrun, told him they were conducting an investigation, and asked LeBrun to accompany them. LeBrun asked what the investigation was about. Corporal Hunter told him that they could not tell him what it was about, but that it had nothing to do with his family. LeBrun, believing that it had to do with certain potentially illegal activities of his employer, agreed to accompany the officers.

Once outside, LeBrun was told by the officers that they would give him a ride. LeBrun offered to drive himself, but the officers told him they would prefer he ride with them. LeBrun rode to the Highway Patrol Station in the front passenger seat of an unmarked highway patrol car. Both Agent Early and Corporal Hunter carried firearms, however, LeBrun was only aware that Corporal Hunter was armed.

Once at the Highway Patrol Station, LeBrun was told that he was not under arrest, and that he was free to terminate the interview and leave the building at any time. Agent Early, who had not yet identified himself as an NCIS investigator, advised LeBrun that he was subject to audio and video recording anywhere in the building. Agent Early then led LeBrun to the interview room. The walls of the windowless room were covered with the enlarged photos from LeBrun's life. LeBrun was seated in a straight chair with his back to the wall. Once seated, Agent Early identified himself as an NCIS investigator. Agent Grebas entered a short time later and began the interview. Agents Early and Grebas sat in chairs with armrests and rollers a few feet in front of LeBrun. No furniture was positioned between the agents and LeBrun. The agents were not armed while in the interrogation room.

Agents Early and Grebas admittedly lied to LeBrun about the level of evidence they had implicating him in Muns' disappearance. Early during questioning, Agent Early told LeBrun, "There is absolutely no doubt that you were responsible for Ensign Muns death. Absolutely no doubt about it. I know you know that. I know you believe it. I believe it."[4] The agents also intimated that they had two eyewitnesses to Muns' death and a suicide note written by a third individual that implicated LeBrun in Muns' death. Agent Early indicated that the only issue he and Agent Grebas were interested in was whether Ensign Muns' death was premeditated or spontaneous. Agent Early also told LeBrun, "[W]e have information and we have evidence that is going to result in grand jury proceedings."[5] The agents told LeBrun that they were ready to proceed with a premeditated murder charge against him, that he would be extradited to Alaska, his reputation would be destroyed, his family's reputation would be destroyed, and he would be financially ruined. The Agents also told LeBrun that Muns' family would file a civil suit against him and asked LeBrun, "How do you think [Jon Benet Ramsey's] family is living today."[6] The agents advised LeBrun that Ensign Muns' family was present at the Highway Patrol Station and were prepared to forgive him if he admitted to a spontaneous killing.[7]

After approximately thirty-three minutes, LeBrun confessed to the murder of Ensign Muns. He stated that Muns walked into the disbursement office while he was stealing money from the ship's safe. According to LeBrun, he panicked and killed Muns. LeBrun then went on to describe how he disposed of the victim's body and eventually reenacted the murder with Agent Early in the role of the victim. After the

---

[4]   Interrogation Tr. at 4.

[5]   Id. at 5.

[6]   Id. at 13.

[7]   Ensign Muns' sister and a law enforcement agent masquerading as Muns' brother were, in fact, in another room at the station.

reenactment, LeBrun asked to use the bathroom and requested a cigarette break. Special Agent Early accompanied LeBrun to the restroom and then escorted him outside for a cigarette.[8] After reentering the station, LeBrun was asked if he wanted to apologize to Muns' sister. She entered the interview room, along with Special Agent Billington of NCIS who represented to LeBrun that he was Muns' brother. Agents Early and Grebas knew that LeBrun was recovering from cancer and told him that the agent posing as Muns' brother had advanced cancer and had only a short time to live. Agent Billington told LeBrun that he wanted to find out everything about his "brother's" death. LeBrun became emotional and apologized to Muns' sister for his death. He asked if he could maintain contact with the family as he uncovered more memories about the death, but was advised that he should communicate through NCIS agents. In total, the interview lasted approximately two hours. At its conclusion, LeBrun consented to a search of his home. Agents Early and Grebas drove LeBrun home and conducted the search. LeBrun was not arrested that day, but was later arrested and indicted for felony murder.

LeBrun moved to suppress inculpatory statements made during the interview. LeBrun claimed that he was subjected to a custodial interrogation without the benefit of Miranda warnings and that his confession was involuntary. The Government

---

[8]   Agent Early testified that he accompanied LeBrun to the restroom because he also needed to use the facilities. He further testified that, although he didn't smoke, he escorted LeBrun outside to ensure he would be able to get back into the building and to ensure he wouldn't hurt himself or others. LeBrun testified that he believed Agent Early was "escorting" him. The district court, in its findings of fact, determined that LeBrun's account and testimony at the suppression hearing were more credible. "Because the district court is in a better position to assess the credibility of the witnesses, its determinations regarding credibility are 'virtually unreviewable on appeal.'" United States v. Black, 88 F.3d 678, 680 (8th Cir. 1996) (quoting United States v. Heath, 58 F.3d 1271, 1275 (8th Cir.1995)). We find no clear error in the district court's decision to credit LeBrun's testimony on these questions.

argued that LeBrun's confession was voluntary and that he was not in custody, thus no Miranda warning was required. The district court concluded that all but two of the factors outlined in United States v. Griffin, 922 F.2d 1343, 1379 (8th Cir. 1990), weighed in favor of a finding that LeBrun was in custody and that LeBrun's confession was inadmissible based on the failure to advise LeBrun of his Miranda rights. The district court also found LeBrun's confession to be involuntary based on the totality of the circumstances.

## II.

The review of a district court's "in custody" determination for Miranda purposes involves a "mixed question of law and fact requiring '[t]wo discrete inquiries.'" Evans v. Rogerson, 223 F.3d 869, 872 (8th Cir. 2000) (citing Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 459, 133 L. Ed. 2d 383 (1995)). We will uphold findings of historical fact unless they are clearly erroneous, but we review the application of the controlling legal standard to the facts de novo. United States v. Axsom, 289 F.3d 496, 500 (8th Cir. 2002).

## III.

There is no dispute that LeBrun was not formally placed under arrest either before, or immediately after his interrogation by Agents Early and Grebas. However, formal arrest is not the only circumstance where Miranda warnings must be given. Miranda requires that any time a person is subject to custodial interrogation, a law enforcement officer must, prior to commencing questioning, advise the person of his right to be free from compulsory self-incrimination and of his right to have the assistance of counsel. Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. A determination of whether an individual is in custody requires a careful evaluation of the totality of the circumstances. United States v. Hanson, 237 F.3d 961, 963 (8th Cir. 2001). To determine whether LeBrun was entitled to have the Miranda warning read to him, we

must decide whether the questioning of LeBrun by Agents Early and Grebas was custodial in nature.

The mere fact that an investigation has focused on a particular suspect does not trigger the need for Miranda warnings in noncustodial settings. Minnesota v. Murphy, 465 U.S. 420, 431, 104 S. Ct. 1136, 1144, 79 L. Ed. 2d 409 (1984). Rather, a suspect is deemed "in custody" and entitled to Miranda warnings only when he has been formally arrested or when he is "deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444, 86 S. Ct. at 1612; Berkemer v. McCarty, 468 U.S. 420, 429, 104 S. Ct. 3138, 3144-45, 82 L. Ed. 2d 317 (1984). To make this determination, we must examine the physical and psychological restraints placed on the suspect during the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be custodial. Griffin, 922 F.2d at 1349 (citing Berkemer, 468 U.S. at 442, 104 S. Ct. at 3151). We must also examine "the place, purpose and length of the interrogation, the suspect's freedom to leave the scene, and other indicia of custody." Griffin, 922 F.2d at 1349. "The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323, 114 S.Ct. 1526, 1529, 128 L. Ed. 2d 293 (1994).

While not an exhaustive list, we have identified relevant mitigating and aggravating factors to be considered in determining whether, under the totality of the circumstances, a suspect is in custody. Griffin, 922 F.2d at 1349. These factors are:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to

-8-

questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. The first three Griffin factors, if answered affirmatively, weigh against a finding of custody, while the last three factors weigh in favor of a finding of custody.

There is no dispute that Agents Grebas and Early informed LeBrun, prior to the commencement of questioning, that he was not under arrest. Additionally, Agents Early and Grebas both testified that LeBrun was free to leave the interrogation at any time. The appellant contends that Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), controls the issue. In Mathiason, a police officer investigating a theft left his card at the suspect's apartment with a note asking him to call. Id. at 493, 97 S. Ct. at 713. The suspect called the officer and the officer and the suspect met at the state patrol office, approximately two blocks from the suspect's home, a short time later. Id. The officer met the suspect in the hallway, took the suspect to a room, and advised him that he was not under arrest. Id. Only five minutes after arriving at the office, the suspect admitted to the theft. Id. The Supreme Court found the situation non-custodial, relying on the suspect's voluntary presence at the police station, the short duration of the interview, and the fact that his freedom to depart was not in any way restricted. Id. at 495, 97 S. Ct. at 714.

We find the facts of this case readily distinguishable from Mathiason. In this case, officers whom LeBrun had never met before arrived at his place of employment and requested that LeBrun accompany them in regards to a matter which the officers would not identify. While LeBrun was generally acquiescent in the suggestion of officers to ride with them, it is clear that the officers made affirmative efforts to prevent LeBrun from driving his own vehicle from his office in Oak Grove, Missouri to the Highway Patrol Station in Lee's Summit, Missouri. The two towns are at least

thirteen miles apart and no public transportation is available between them. Because LeBrun rode to the station with the officers, on the suggestion of the officers, he was dependent on those same authorities for a ride home. While there was no affirmative lie told to LeBrun regarding the purpose of the interview, as in Hanson, 237 F.3d at 964 (officers told suspect they wanted him to view photos of recent vandalism at an abortion clinic, but actually sought to question the suspect about an arson attempt), the authorities clearly employed a planned strategy to prevent LeBrun from realizing the true nature of the interview until he was at the Highway Patrol Station.[9] LeBrun did not know, at the time of his consent to accompany the officers, that they were going to question him about Muns' disappearance and "therefore did not 'voluntarily acquiesce' to the subsequent interrogation." Id.

The district court described the interview room as a "rectangular, windowless room the dimensions of which are difficult to discern." This finding is not clearly erroneous based on our review of the video recording of the September 21, 2000, interview. The walls of the room were covered in enlarged photos of scenes from the U.S.S. Cacapon and from LeBrun's life. No furniture separated LeBrun, who was seated with his back to the wall in a straight chair, from Agents Grebas and Early, who were seated approximately three feet from LeBrun on either side of him. LeBrun was advised that he was subject to audio and video recording, and indeed, the interview and LeBrun's subsequent confession were videotaped by a camera stationed behind an observance mirror in the room. Almost immediately, the agents began telling LeBrun that they were positive he had killed Ensign Muns. They told him they had evidence that would result in grand jury proceedings. Agent Early told LeBrun, "I know you are responsible for Ensign Muns . . . I know that. We can show

_____

[9]    Prior to September 21, 2000, LeBrun had only dealt with Special Agent Hughes of the NCIS. In his previous contacts with law enforcement, Agent Hughes always contacted LeBrun ahead of time to arrange a time and place for an interview.

-10-

that."[10] Agent Grebas intimated that Agent Early was the one who believed an interview should take place, whereas he thought, "I should be going to your work and putting [sic] you in cuffs and taking you out."[11] The agents told LeBrun that the day of the interview was the only day that he would have control over whether he kept his house, his pregnant wife, his stepdaughter, and his job. They stated, "If you choose to play hardball, then . . . we are going to criminal court."[12] Then, referencing a potential media frenzy and the Jon-Benet Ramsey case, the agents told LeBrun that Ensign Muns' family was very wealthy and was prepared to take him to civil court over the matter.

In Stansbury, the Supreme Court held that "an officer's evolving but unarticulated suspicions do not affect the objective circumstances of an interrogation or interview, and thus cannot affect the Miranda custody inquiry." Stansbury, 511 U.S. at 323, 114 S. Ct. at 1529. Nonetheless, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned . . . . Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action.'" Id. at 325, 114 S. Ct. at 1529. Similarly, the tactic of lying to a suspect about the evidence police have does not make a confession per se invalid, but can be considered in evaluating the totality of the circumstances. See Frazier v. Cupp, 394 U.S. 731, 737-39, 89 S. Ct. 1420, 1424, 22 L. Ed. 2d 684 (1969). We believe that a reasonable individual, placed into the police-dominated environment of the interview room in this case, and confronted with threats of criminal charges, civil lawsuits, and the loss of those aspects of his life most important to him, would feel a substantial diminishment in his

---

[10] Interrogation Tr. at 6.

[11] Id. at 11.

[12] Id. at 13.

-11-

freedom of action. Similarly, a reasonable person, told by authorities that they possess "incontrovertible" evidence of criminal guilt, would unlikely feel free to leave the interrogation. As stated in <u>Hanson</u>, "[t]he agents wanted a confession . . . and it appears that they deliberately waited until they had the suspect in an intimidating environment before they advised him of their true purpose for bringing him to the station." <u>Hanson</u>, 237 F.3d at 965.

"Any interview of one suspected of a crime by a police officer will have coercive aspects to it simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." <u>Mathiason</u>, 429 U.S. at 495, 97 S. Ct. at 714. Nonetheless, we have found that "[a] strong presumption of impropriety attaches to any circumstances where this Court detects the use of coercive interrogation techniques to obtain confessions." <u>Griffin</u>, 922 F.2d at 1351 (citing <u>United States v. Carter</u>, 884 F.2d 368, 371 (8th Cir. 1989)). The district court found that Agents Early and Grebas employed at least two such coercive techniques: the "friendly-unfriendly" or "Mutt and Jeff" routine and the "cast blame on the victim" tactic, both coercive police strategies discussed in <u>Miranda</u>, 384 U.S. at 452, 86 S. Ct. at 1616. Despite the appellant's objection, we cannot say that the district court committed clear error in finding that these techniques were used. Indeed, evidence of the "Mutt and Jeff" routine is evident in the videotape of the interrogation. Agent Early generally maintained a conversational, friendly tone of voice while Agent Grebas would often assume an unfriendly, antagonistic demeanor. Agent Early repeatedly assured LeBrun that he only wanted to "get to the truth about what happened."[13] Agent Grebas, on the other hand, repeatedly told LeBrun that he was against the interview and believed that LeBrun should be arrested for premeditated murder. While not used heavily, a finding that the "blame the

---

[13]     Interrogation Tr. at 7

-12-

victim" tactic was used is also supported by the videotape of the interrogation.[14]  In addition to these tactics, the record is full of instances where the agents attempted to "bond" with LeBrun,[15] to appeal to his loyalty to his family, and to threaten his social and financial demise if he didn't cooperate.  We believe these factors weigh heavily in favor of a finding of custody.

Also relevant to our inquiry is the length and tenor of the interrogation.  While Miranda was concerned primarily with lengthy "marathon" interrogations, custody may be found in relatively brief interrogations where the questioning is of a sort where "the detainee is aware that questioning will continue until he provides his interrogators the answers they seek." Griffin, 922 F.2d at 1348 (citing Berkemer, 468 U.S. at 439, 1349 S. Ct. at 3149).  In this case, Agents Early and Grebas told LeBrun on five separate occasions that he could go home at the conclusion of the interview.  At one point, Agent Early said, "You know what?  When you say, 'You know what Special Agent Early, I killed him.' You know what. We can stop.  Because you know why, you can say this, it wasn't premeditated.  It was spontaneous.  That's all you need to say and we are done."[16]  We believe that a reasonable person in LeBrun's position would believe that questioning was going to continue until the NCIS agents obtained the information they sought.

---

[14]  Agent Grebas stated, "It's under the little thing of why, that is why is it premeditated.  Think two weeks out of the box.  You know, I didn't like Andy Muns and you didn't like Andy Muns.  Why?  Because you were that person on the ship.  You ran that disbursing office.  You had done your time and then in comes this boot officer.  You know what, he was a snotty-nosed kid who probably didn't deserve to wear an officer's uniform." Interrogation Tr. at 16.

[15]  For example, Agent Grebas described to LeBrun how he had a killed a man in the line of duty.  See Interrogation Tr. at 19-20.

[16]  Interrogation Tr. at 16.

The appellant reminds us repeatedly that, without LeBrun's confession, there is insufficient evidence to proceed with prosecution in this case. While this may appear to be an unjust result, we are reminded of the words of former Chief Judge Richard S. Arnold in <u>Williams v. Nix</u>, 700 F.2d 1164 (8th Cir. 1983), <u>rev'd</u>, 467 U.S. 431, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984):

> A system of law that not only makes certain conduct criminal, but also lays down rules for the conduct of the authorities, often becomes complex in its application to individual cases, and will from time to time produce imperfect results, especially if one's attention is confined to the particular case at bar. Some criminals do go free because of the necessity of keeping government and its servants in their place. That is one of the costs of having and enforcing a Bill of Rights. This country is built on the assumption that the cost is worth paying, and that in the long run we are all both freer and safer if the Constitution is strictly enforced.

<u>Id.</u> at 1173. Weighing against a finding of custody in this case are simply the facts that LeBrun was advised he was free to leave and was not arrested at the conclusion of the interrogation. However, we believe that the record reflects restrained freedom of movement,[17] less than voluntary acquiescence to questioning, the employment of deceptive stratagems by law enforcement, and a police-dominated atmosphere. Based on the totality of the circumstances, we believe that a reasonable person in LeBrun's position would have felt a substantial restraint on his freedom to leave the interrogation. Thus, LeBrun was in custody at the time of his initial confession and should have been provided with Miranda warnings.

IV.

---

[17] While Agent Early's "escort" of LeBrun to the restroom and outside took place after LeBrun's initial confession, they are still demonstrative of the overall tone of the interrogation. While not necessary to our finding that LeBrun's freedom was restricted, this evidence lends additional support to our finding that LeBrun was in custody.

-14-

Even were we to find that LeBrun was not in custody for purposes of Miranda, we would still affirm the decision of the district court because LeBrun's confession was involuntary. The voluntariness of a confession is a legal inquiry subject to plenary review by the appellate courts. Miller v. Fenton, 474 U.S. 104, 114, 106 S. Ct. 445, 452, 88 L. Ed. 2d 405 (1985). In determining whether a confession was voluntary we must examine the entire record for evidence that the statement was given under such circumstances which would indicate that the defendant was coerced or his will overborne. Davis v. North Carolina, 384 U.S. 737, 742, 86 S.Ct. 1761, 1764, 16 L. Ed. 2d 895 (1966); see also Rachlin v. United States, 723 F.2d 1373, 1377 (8th Cir. 1983). In this analysis the court employs a flexible totality of the circumstances approach, considering the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. Rachlin, 723 F.2d at 1377. Custodial statements are presumed involuntary and the government must overcome the presumption by a preponderance of the evidence. Tippitt v. Lockhart, 859 F.2d 595, 597 (8th Cir. 1988), cert. denied, 490 U.S. 1100, 109 S. Ct. 2452, 104 L. Ed. 2d 1007 (1989).

LeBrun, at the time of the September 21, 2000, interview, was in his mid-fifties and had recently recovered from cancer. He had completed college and attended one year of law school. He was employed as a project manager for a real-estate sales company. He was married with a stepdaughter and another child on the way. He had been interviewed by law enforcement regarding Muns' disappearance several times less than a year prior to his confession. On three of those occasions, LeBrun was advised of his Miranda rights. LeBrun had no other contact with law enforcement prior to 1999.

"Numerous cases have held that questioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the

defendant's will to be overborne." Jenner v. Smith, 982 F.2d 329, 334 (8th Cir. 1993). Indeed, "'[T]here is nothing inherently wrong with efforts to create a favorable climate for confession.'" Id. (citing Hawkins v. Lynaugh, 844 F.2d 1132, 1140 (5th Cir. 1988, cert. denied, 488 U.S. 900, 109 S. Ct. 247, 102 L.Ed.2d 236 (1988)). In this case, Agents Early and Grebas lied about the evidence against LeBrun. They told him they possessed "incontrovertible" evidence, including eyewitness testimony, that he had killed Ensign Muns. They told him that if he resisted confessing, he would be subject to charges in Anchorage, Alaska. The agents played on LeBrun's specific concerns over his health and his pregnant wife by telling him that a criminal trial would ruin his family's good name and his family's financial resources would be drained from the expense of defending himself in Alaska. Additionally, the agents repeatedly told LeBrun that if he confessed to a "spontaneous" act, he could not be prosecuted because the statute of limitations had expired. Finally, the agents told LeBrun that Muns' sister was waiting in the next room and that she was willing to forgive him if he admitted to spontaneously killing Muns.

We believe that separately, lies and strategies such as these would not be sufficiently coercive to cause an individual in the position of LeBrun to have his will overborne. However, when viewed as a whole, it appears that the entire atmosphere of the interrogation was police-dominated, highly coercive, and designed to elicit a confession in any way possible. We are particularly troubled by the repeated statements to LeBrun to the effect that he could only be prosecuted for a premeditated murder. Agents continually intimated to LeBrun that they had a great deal of control over what charges would be brought against him. Agents Early and Grebas told LeBrun that if he confessed to spontaneously killing Muns, he would not be prosecuted. Appellant urges us to find that LeBrun simply misunderstood the legal consequences of his confession, through no fault of the interrogating officers, and that his confession should be held voluntary. See Winfrey v. Wyrick, 8367 F.2d 406 (8th Cir. 1987) (defendant's murder confession voluntary even though he mistakenly

believed that an element of the charge would be negated if the crime was accidental); United States v. Larry, 126 F.3d 1077 (8th Cir. 1997) (promise not to prosecute for drive-by shooting did not render confession to being a felon-in possession of a firearm involuntary).

Viewing the interrogation as a whole, however, it appears clear that a reasonable person in LeBrun's position would have perceived the statements of the agents as a promise of nonprosecution if LeBrun confessed to a spontaneous act. This is distinguishable from cases such as Larry, where a defendant is promised that he will not be charged for the crime under investigation, but admits to facts comprising a distinct and separate crime. After LeBrun told Agents Early and Grebas that he believed there was no statute of limitations on homicide, Agent Early responded, "It depends on how the act was completed . . . premeditation or not." It is clear from reading the transcript and viewing the videotape of the interrogation that Agents Grebas and Early were attempting to get LeBrun to admit that Muns caught him stealing money from the disbursement office safe and that LeBrun killed Muns to avoid getting caught. Admission of those facts constitutes felony murder. Yet, Agents Early and Grebas clearly led LeBrun to believe that there were only two possible types of murder for which he could be charged–premeditated or spontaneous. The following colloquy is demonstrative:

> GREBAS: And if you will be man enough and stand up to the plate and say, You know what guys, it was spontaneous." We are on the phone saying we got a problem with the statute of limitation. It's possible, beyond possible; you won't be prosecuted at all. And I want to throw-up when I say that, but I will–that's my word to you.
>
> LEBRUN: Right
>
> GREBAS: Special Agent Early?
>
> EARLY: Absolutely.

-17-

LEBRUN:  What's the statute of limitation?

GREBAS:  There is no second-degree murder.

EARLY:  It's five years from the time of the incident. It's called "manslaughter" in the federal system.

LEBRUN:  Okay.

EARLY:  Tell the truth.

GREBAS:  Now, it was spontaneous; is that right, Michael? It was, the choice was, either I was going to brig, either I was going to the brig, or Andy Muns had to die and that was a selfish act. That's the first step in this. I am ready to go to the phone.

LEBRUN:  So, am I hearing that I won't be prosecuted?

GREBAS:  That's what you are hearing.

LEBRUN:  Is that what I am hearing?

GREBAS  That's what you are hearing.

EARLY:  If it's spontaneous and that's the truth, you will not be prosecuted.

GREBAS:  That's absolutely right.

LEBRUN:  I am here to tell you there was no premeditation.

EARLY:  All right.

LEBRUN:  It was spontaneous.[18]


Appellant contends that Agents Early and Grebas used the term "spontaneous" interchangeably with the specific legal term, manslaughter. However, the only mention of "manslaughter" in the transcript of the interrogation occurs on page twenty-one, whereas the agents discuss spontaneous versus premeditation more than a dozen times before the singular mention of manslaughter. Viewing the entire tenor of the interrogation, the attempt to qualify the term spontaneous seems like nothing

---

[18]  Interrogation Tr. at 20-21.

more than a desperate attempt to make the record appear as the agents meant it to appear, rather than how it actually did. Such trickery, coupled with the coercive tactics outlined above, lead us to believe that LeBrun's confession was involuntary in light of the totality of the circumstances.

V.

The Government concedes that a finding that LeBrun's initial confession to Agents Early and Grebas was illegal would necessitate a finding that LeBrun's second confession to Muns' sister was "fruit of the poisonous tree," pursuant to Wong Sun v. United States, 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441 (1963). Because we find that LeBrun was in custody at the time of his initial confession, and because that confession was involuntary, we also find that LeBrun's statement to Muns' sister was illegally obtained. We, therefore, affirm the judgment of the district court.

HANSEN, Circuit Judge, dissenting.

I do not agree that LeBrun was "in custody" within the meaning of Miranda v. Arizona, 384 U.S. 436 (1966), at the time he confessed to killing a superior officer and to disposing of the body in a tank of caustic fuel oil. Nor do I agree that LeBrun was "in custody" at the time he voluntarily reenacted the homicide, demonstrating how he strangled Ensign Muns while smashing his head against the deck of the disbursing office. Nor do I agree that LeBrun was "in custody" at the time he apologized to Muns' sister for killing her brother. Finally, I do not agree that LeBrun's confessions to and reenactment of Muns' killing were the product of compulsion. Accordingly, I respectfully dissent.

-19-

I find the court's attempt to distinguish this case from <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977), unpersuasive, and I conclude that <u>Mathiason</u> is on all-fours with this case. The court first notes that the officers transported LeBrun thirteen miles to the Highway Patrol Station and that LeBrun was therefore dependent on the authorities for transportation, whereas Mathiason walked only a short distance to the state patrol office thereby rendering him independent of the authorities. <u>Id.</u> at 495. In my view, the distinction is unavailing. The court ignores the fact that LeBrun carried his cellular phone in his pocket during the entire interview. He was free to make and receive calls during the entire interview. The videotape of the interview shows that LeBrun telephoned his wife from the Highway Patrol Station during the course of the interview. Thus, unlike the defendant in <u>United States v. Hanson</u>, 237 F.3d 961, 965 (8th Cir. 2001) (finding "custody" because, among other things, the defendant was dependent on authorities for transportation back to his residence), LeBrun was not dependent upon the authorities for transportation. LeBrun could have easily arranged for alternative transportation by calling a coworker, a friend, a relative, his spouse, or even a taxicab.

The court also recites facts from which it concludes that this interview was conducted in a police-dominated environment and in a coercive manner. Specifically, the court notes the small dimensions of the interview room, the agents' admittedly coercive interview tactics, and the agents' misrepresentation of the evidence they had collected against LeBrun. As the majority correctly notes, however, "a noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because . . . the questioning took place in a 'coercive environment.'" <u>Mathiason</u>, 429 U.S. at 495. Indeed, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." <u>Id.</u> The fact that the atmosphere was police-dominated is unsurprising, as the interview took place in a highway patrol station. Also, the fact that the agents

-20-

exaggerated the amount of evidence that had been collected against LeBrun bears little on the custody issue.  Id. at 495-96 (stating that fact that officer lied about finding defendant's fingerprints at the scene of the crime had "nothing to do with whether respondent was in custody for purposes of the Miranda rule").  Thus, the facts upon which the court relies do not distinguish this case from Mathiason; rather, the Mathiason Court considered analogous facts and concluded that they did not convert a noncustodial interview into a custodial interrogation.  Cf. Mathiason, 429 U.S. at 494 (recognizing that the interview took place behind closed doors, that the officer told the defendant that he was a suspect, and that the officer falsely told the defendant that the police had evidence against him).

In addition, the court overstates the coercive aspects of this interview in an attempt to distinguish Mathiason.  LeBrun was never physically restrained.  He was never placed in handcuffs.  Unlike the defendant in Hanson, LeBrun was transported to the Highway Patrol Station in the front seat of an unlocked patrol vehicle.  As aforementioned, LeBrun had his cellular phone with him during the interview, and he called his wife from the interview room.  While the mere possession of a cellular phone without more will not transform a custodial interrogation into a noncustodial one, it is relevant to the question of whether the interview was coercive and whether a reasonable person in the same circumstances would feel restrained.  See United States v. Unser, 165 F.3d 755, 766 (10th Cir.) (noting that use of a cellular phone during an interview is a factor supporting a finding of no custody), cert. denied, 528 U.S. 809 (1999).  The cellular phone provided LeBrun a line of communication between himself and the outside world. The possession of a cellular phone mitigates the incommunicado nature of interrogations with which the Miranda Court was concerned and dulls the psychological pressure associated with being isolated in an interview room.

In its custody analysis, the court simply fails to consider that LeBrun's age and experience militate against a finding of "custody." In our objective "custody" analysis, the relevant inquiry is not whether any random reasonable person would have determined that he was "in custody," but whether a reasonable person in the defendant's position would have considered his freedom of action restricted to the degree associated with a formal arrest. Feltrop v. Bowersox, 91 F.3d 1178, 1181 (8th Cir. 1996), cert. denied, 520 U.S. 1242 (1997). LeBrun's age, work experience, education, specifically his legal training, and his past experience with NCIS agents militate against a finding of custody. See United States v. Rorex, 737 F.2d 753, 756 (8th Cir. 1984) (stating that the age and experience of the interviewee is a relevant factor in the custody determination). LeBrun is in his mid-fifties. He is a military veteran and is gainfully employed as a manager in a real estate office. He has a college education and has completed one year of law school. In short, LeBrun is an educated, somewhat sophisticated individual. More importantly, LeBrun had past experience and dealings with NCIS investigators. NCIS agents interviewed LeBrun on four different occasions. Significantly, in none of the prior interviews was LeBrun placed under arrest. Thus, on this occasion, after learning that the interviewers were NCIS agents, LeBrun could draw upon his experiences with other NCIS agents to conclude that he likely would not be arrested here. LeBrun would have no reason to disbelieve the agents when they explicitly informed him before entering the Highway Patrol Station that he was not under arrest and that he was free to leave at any time. LeBrun also would have no reason to disbelieve the agents when they told him on three separate occasions during the interview that he was free to leave and that he could go home. In fact, the district court explicitly found that at the start of the interview LeBrun believed he could terminate the interview and leave if he wanted to. (R. at 62.) The fact that Agents Early and Grebas did not arrest LeBrun after the interview supports the conclusion that LeBrun was not "in custody." See United States v. Sutera, 933 F.3d 641, 647 (8th Cir. 1991) (stating that it was a "very important" fact that the officers did not contemplate arresting the defendant).

-22-

Viewing the totality of the circumstances, I conclude that a reasonable, college educated, and legally trained person who has had prior experience with the practice and procedure of a particular law enforcement organization, who willingly agreed to be interviewed, who was specifically told on four different occasions during the course of the interview that he was not under arrest or could go home, and who could easily facilitate transportation from the interview site via cellular phone would not have perceived that his freedom of action was restrained to the degree associated with formal arrest. I conclude that this case is controlled by Mathiason in all relevant respects and, accordingly, would reverse the judgment of the district court.

Likewise, I do not agree with the conclusion that LeBrun's incriminating statements were compelled. The appropriate test for determining whether a confession was involuntarily made is whether the totality of the circumstances surrounding the confession indicates that "the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001). This requires that we look at "both the conduct of agents and [the defendant's] capacity to resist pressure to confess." Id.

Neither Agent Grebas nor Agent Early was armed during the interview. (R. at 62.) The district court found that the agents never shouted at LeBrun (R. at 61) or physically threatened him (R. at 68). Review of the interview videotape demonstrates that this finding is not clearly erroneous. The government concedes, however, that it used psychological coercion to facilitate a confession. While some of the psychological pressure employed in this case was creative, much of it was standard interview technique, and the government's use of such tactics does not render a confession involuntary per se. For example, we have previously held that tactics such as subjecting a suspect to psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him did not render a confession

-23-

involuntary. Astello, 241 F.3d at 967-68. The court correctly recognizes that the type of psychological pressure Agents Grebas and Early exerted on LeBrun here did not alone render his confession involuntary. The court concludes, however, that these tactics, when coupled with the agents' statements concerning nonprosecution, rendered his confession involuntary. I most respectfully disagree.

It is unclear if any promise was even made here. The transcript demonstrates that Agent Grebas qualified his statements, stating that it was only "possible" that LeBrun would not be prosecuted. (Tr. at 20-21.) In addition, it is unclear what the promise–if any–was. It is unclear whether the agents told LeBrun that he could not be prosecuted for murder or whether the agents simply told LeBrun that he could not be prosecuted for "spontaneous murder." Finally, the district court explicitly rejected the magistrate judge's findings regarding the alleged promises not to prosecute. The district court found only that "LeBrun believed he would not be prosecuted if he confessed to a 'spontaneous' murder." (R. at 83-84.) The district court did "not make any findings as to what–if any–promise was actually made, or what the legal effect of any promise [was]." (Id.) Thus, our court relies upon facts the district court specifically declined to find. Applying the facts as actually found by the district court, I conclude that LeBrun's confession was not compelled because a defendant's mistaken belief that he could not be prosecuted does not render a confession involuntary. See United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (stating that defendant's mistaken belief that he had been promised leniency would not render confession involuntary); Winfrey v. Wyrick, 836 F.2d 406, 411-12 (8th Cir. 1997) (concluding that defendant's murder confession was voluntary even though defendant was encouraged to talk because of erroneous belief that if the shooting was accidental it would negate an element of the offense), cert. denied, 488 U.S. 833 (1988).

Moreover, even assuming that a reasonable person would view the agents' statements as a promise, a promise made by law enforcement officers is only one

relevant consideration in assessing police conduct and does not render a confession involuntary per se. See Simmons v. Bowersox, 235 F.3d 1124, 1133 (8th Cir. 2001), cert. denied, 122 S. Ct. 280 (2001); see also Tippitt v. Lockhart, 859 F.2d 595, 598 (8th Cir. 1988) (holding that a custodial statement given in exchange for a promise that the defendant would not be charged with capital felony murder "was the product of his rational and voluntary decision and that the officers' promise did not coerce or overbear his free will"), cert. denied, 490 U.S. 1100 (1989). Thus, in United States v. Larry, 126 F.3d 1077 (8th Cir. 1997), we held that the defendant's statement implicating himself as being a felon in possession of ammunition was voluntary even though it was induced by a promise that the defendant would not be prosecuted for a separate offense involving a drive-by shooting. Id. at 1079. After viewing the interview videotape, I do not seriously doubt that the discussions concerning nonprosecution were the but-for causes of LeBrun's confession. That is, LeBrun might not have confessed absent the discussion not to prosecute. The Court has indicated, however, that in the context of determining the voluntariness of a confession, a but-for type analysis is inadequate. Schneckloth v. Bustamonte, 412 U.S. 218, 224 (1973) ("Under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind."). Instead, courts must look at the totality of the circumstances surrounding the confession and balance the complex of values implicated in questioning a subject. Even accounting for any potentially coercive impact that Agent Early's and Agent Grebas's statements might have had on LeBrun, I conclude that his confession was freely and voluntarily made and was not the product of unconstitutional compulsion.

I place substantial weight on the fact that LeBrun confessed after a mere thirty-three minutes of conversation with the agents. Thus, this is not a situation where the agents wore down a defendant's will with persistent questioning over a considerable length of time. I also place significant weight on the fact that LeBrun testified that

he had a subjective understanding of his <u>Miranda</u> rights at the time of the interview. (R. at 61.)  <u>See</u> <u>Simmons</u>, 235 F.3d at 1133-34 (stating that a particularly compelling fact militating in favor of finding a voluntary confession was that defendant understood his rights).  I also place substantial weight on the fact that LeBrun was a sophisticated individual with legal training.  As we have noted, "one of the key concerns in judging whether confessions were involuntary, or the product of coercion, [is] the intelligence, mental state, or any other factors possessed by the defendant that might make him particularly suggestible, and susceptible to having his will overborne."  <u>Wilson v. Lawrence County</u>, 260 F.3d 946, 952 (8th Cir. 2001).

LeBrun did not display any unique sensitivity that would indicate the police might overbear his will.  LeBrun had met with NCIS investigators on four prior occasions.  The videotape demonstrates that LeBrun was aware of his surroundings and the circumstances confronting him.  In fact, as LeBrun and the agents discuss the potential statute of limitations problems, LeBrun becomes more animated and much more interested in the interview.  After watching the videotape, I conclude that LeBrun is an intelligent, calculating person who erroneously perceived a potential "out" or loophole in the prosecution's case and tried to take advantage of it by confessing to "spontaneous" murder. Whatever his motivation, we rarely conclude, absent physical coercion, that a confession was made against a person's free will unless the person is of extremely low intelligence or otherwise impaired.  <u>Compare</u> <u>Wilson</u>, 260 F.3d at 953-54 (affirming denial of qualified immunity on coerced confession claim where defendant was mentally handicapped), <u>with</u> <u>Astello</u>, 241 F.3d at 968 (recognizing fact that defendant had completed eleventh grade and was generally mature supported a finding that statement was voluntary); <u>Simmons</u>, 235 F.3d at 1133-34 (finding confession of juvenile defendant with full scale IQ of 88 was voluntary where officers interrogated him for over two hours, threatened him with the death penalty, and lied about the evidence against him); <u>Tippitt</u>, 859 F.2d at 598 (concluding that confession of defendant with eleventh grade education was

voluntary even though it was given in exchange for promise not to pursue capital sentence); <u>Winfrey</u>, 836 F.2d at 408 (finding confession voluntary where defendant had dull-normal IQ and mental age of 14 or 15), 411 (collecting cases). The court's decision departs from the general trend of our cases. Accordingly, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT